**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CONNOR TRUE, M.D.,**

      **Plaintiff,**

**v.**                                    **CASE NO.:** _____

**THE NEMOURS FOUNDATION, d/b/a**
**NEMOURS CHILDREN'S HOSPITAL,**

      **Defendant.**

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, CONNOR TRUE, M.D. ("True" or "Plaintiff"), by and through his undersigned counsel, hereby files suit against Defendant, THE NEMOURS FOUNDATION, d/b/a NEMOURS CHILDREN'S HOSPITAL ("Nemours" or "Defendant").  In support thereof, Plaintiff alleges the following:

**Statement of Jurisdiction and Venue**

1.     This is an action for damages that exceed $15,000.00, exclusive of attorney's fees, costs, and interest.

2.     This action involves claims of discrimination in violation of 29 U.S.C. § 2601 et seq., the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101 et seq., and the Florida Civil Rights Act of 1992 ("FCRA"). This court has jurisdiction over this action pursuant to 42 U.S.C. §12117 and 28 U.S.C. § 1331. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this Court under rule 1.02(c) of the Local Rules of the Middle District of Florida and 28 U.S.C. § 1391 because the unlawful employment practices arose in Orlando, Orange County, Florida, and because the Defendant operates and does business in said County.

## Statement of the Parties

4.      Plaintiff is, and at all times material hereto was, a resident of Orange County, Florida. At all times relevant to this Complaint, Plaintiff was an employee of the Defendant and suffered from or was regarded as suffering from a disability within the meaning of the ADA and the FCRA. At all times relevant to this Complaint, Plaintiff was qualified to perform the essential functions of his job, with or without reasonable accommodation.

5.      Defendant is a Florida not-for-profit corporation, with its principal place of business in Jacksonville, Florida.  At all times material to this Complaint, Defendant operated and maintained Nemours Children's Hospital located in Orlando, Orange County, Florida, where the Plaintiff was employed. At all times material to this Complaint, Defendant was an employer covered by the ADA and the FCRA.

## Exhaustion of Administrative Remedies

6.      On or about June 14, 2021, Plaintiff timely dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR"). A true and correct copy of the Charge of Discrimination is attached as "Exhibit A."

7.      Plaintiff received his Notice of Right to Sue from the EEOC on November 23, 2021.  A true and correct copy of Plaintiff's Right to Sue Notice is attached as "Exhibit B."

8.      Plaintiff has exhausted all administrative remedies and met all related prerequisites prior to filing this lawsuit. Plaintiff timely filed this action within 90 days of receiving the Notice of Right to Sue.

**Statement of the Facts**

9.      Plaintiff began working in the Pediatric Residency Training Program as a Pediatric Resident at Nemours Children's Hospital ("Nemours") located in Orlando, Florida, on June 17, 2019. As part of his employment, Plaintiff signed a Graduate Medical Education Agreement (GMEA) for the 2019-2020 term. He was required to sign a second GMEA for the 2020-2021 term. True and correct copies of both of the subject GMEA  attached hereto as "Exhibit C."

10.     During Plaintiff's residency, he did not receive any reports of issues or concerns regarding his performance.

11.     Beginning in September 2020, Plaintiff began suffering from severe anxiety which substantially limited his activities. As a result, Plaintiff discussed his anxiety issues with the Residency Program Director, Dr. Amber Hoffman, and requested time off to address his mental health.

12.     Specifically, Plaintiff expressed that he was experiencing excessive stress and anxiety which was affecting his ability to think, communicate, and work.

13.     Dr. Hoffman recommended that Plaintiff seek treatment from a psychiatrist and psychologist and provided the names of professionals who could provide treatment.

14.     Plaintiff was granted leave to seek treatment for his anxiety. The leave period was designated by Nemours as a "wellness rotation" and lasted approximately four weeks from late September to mid-October 2020.

15.     The purpose of the "wellness rotation" was not to allow Plaintiff time to study for the Step Three Medical Board Exam, as the Defendant has suggested. In fact, Plaintiff was required, during the wellness rotation, to provide status updates to Dr. Hoffman regarding his mental health treatment and was required, as part of the wellness rotation, to seek and maintain such treatment.

16.     Upon information and belief, Dr. Hoffman discussed Plaintiff's mental health condition and treatment with other physicians employed by Defendant or who otherwise worked at Nemours Children's Hospital. As such, Dr. Hoffman and the hospitalist attending physicians described below regarded Plaintiff as disabled.

17.     When Plaintiff returned to work following his leave, he continued to receive positive performance reviews.

**False Complaints of Mental Instability**

18.     On December 13, 2020, Plaintiff was called into a meeting with a Human Resources Representative, the Program Director (Dr. Hoffman), and two Associate Program Directors, and was presented with false accusations and blatant fabrications regarding his performance for the first time. These complaints were purportedly made by hospitalist attending physicians who had previously provided extremely positive feedback on Plaintiff's performance. One of the attending physicians who complained never worked directly with Plaintiff's team during that rotation.

19.     The complaints all centered around Plaintiff's "mental state" and accused him of "abusing stimulants or his prescription psychiatric medications." None of these individuals should have had knowledge that Plaintiff was seeking psychiatric treatment. Plaintiff had not shared with any of them that he was engaging in psychiatric treatment or taking any prescription psychiatric mediations.

20.     None of the emails stated that Plaintiff's purported behavior or conduct threatened, or in any way disrupted, patient care. Further, none of the e-mails contain any allegation or suspicion that Plaintiff was using or under the influence of marijuana at any time.

21.     Despite the false allegations presented to Plaintiff at this meeting, Plaintiff had never been informed of any alleged mental instability or manic behavior at the time, nor was he ever removed from duty for allegedly being "unable to care for patients" based on any alleged mental instability. Indeed, none of these complaints were ever brought to Plaintiff's attention by these attending physicians during his rotation. Instead, Plaintiff had received only positive feedback about his performance before these emails were presented to him.

22.     Based solely on these meritless complaints, Nemours placed Plaintiff on immediate leave, removing him from his residency rotations.

23.     He was also subjected to an unwarranted and discriminatory drug screen. However, none of these purported complaints stated that Plaintiff was using marijuana or any other illicit drugs, or that he had any sort of substance abuse problem. For example, one email stated that Plaintiff appeared overstimulated on "caffeine or medicine," not illicit drugs.

24.     As Defendant was aware, Plaintiff was being treated for his anxiety with medical marijuana, under the direction and supervision of his mental health provider, he informed Defendant, at that time, that he would likely test positive for THC. Plaintiff's drug screen came back positive for THC.

25.     Plaintiff denies that he was ever under the influence of THC or any illicit drug while on duty. Nor was he ever accused of being under the influence of marijuana while on duty or otherwise during his employment with Nemours.

26.     Plaintiff has never been diagnosed with any form of substance abuse problem.

**Plaintiff was Forced to Submit to an Evaluation or Be Terminated**

27.     On December 24, 2020, following the drug screen, Nemours placed Plaintiff on leave and referred him to Professional Resource Network ("PRN") for evaluation. Plaintiff was given an ultimatum. He could either submit to the PRN evaluation, resign or be terminated. Plaintiff was also responsible for paying for the PRN evaluation at his own expense.

28.     Plaintiff did not voluntarily agree to the PRN evaluation. Instead, he believed that it was necessary to clear him to return to the residency program.

29.     Plaintiff had seen a Cannabis specialist in order to obtain a prescription and a state-approved medical marijuana card. He received the card on January 5, 2021. On January 18, 2021, as part of the PRN evaluation, Plaintiff was subjected to a rigorous drug and alcohol screening, and he again tested positive for THC.

30.     The PRN evaluator met with Plaintiff on only one occasion for approximately one hour. The evaluator agreed with the recommendation of Plaintiff's psychiatrist that he continue treatment of his anxiety with medical marijuana.

31.     On February 8, 2021, Plaintiff received the PRN evaluation report which referred him to a months-long in-patient treatment program, as well as, a two (2) year strict monitoring program. This referral was based on alleged illicit drug abuse, despite the evaluator's knowledge of his approved treatment with medical marijuana. This treatment program would again be at Plaintiff's expense, at the cost of approximately $25,000.00.

32.     In addition to the harsh nature of the required treatment, Plaintiff could not afford the cost of the treatment program. As such, Plaintiff requested a second independent (non-PRN) evaluation at his own cost, which was denied by Nemours. As Plaintiff cannot afford the cost of the treatment program, Plaintiff has not been able to complete the treatment program required by Nemours.

33.     As of this date, Plaintiff has not been allowed to return to the residency program. He remained on leave from December 24, 2020 until September 15, 2021 when his employment was terminated by Defendant.  As the purpose of a residency program is to train the resident to become a practicing physician, Nemours' removal of Plaintiff from participation in the residency program has stifled his education and progression toward becoming a practicing physician. Defendant's termination of Plaintiff has all but ended Plaintiff's medical career.

34.     As a result, Plaintiff has incurred substantial expense, suffered a significant loss of income, damage to his reputation, detrimental interruption and delay in his residency/medical education, and damage to his medical career.

## Count I: Disability Discrimination in Violation
## of the Americans with Disabilities Act

35. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

36. Plaintiff suffers from a disability as defined under the ADA. Specifically, Plaintiff was diagnosed with anxiety, a mental and emotional impairment which substantially limits his thinking, communicating, and working, which thereby affects his ability to work and treat patients. Plaintiff is a qualified individual with a disability.

37. At all times material to this Complaint, Plaintiff was able to perform and did perform the essential functions of his job duties as a pediatric resident, with or without reasonable accommodation. He consistently received positive performance reviews from everyone he worked with at Nemours Children's Hospital. At all times material to this Complaint, Plaintiff was otherwise qualified to do his job.

38. Although Plaintiff was using medical marijuana to treat his anxiety, he did so under the direction and supervision of a licensed health care professional. Plaintiff obtained a prescription and a state-approved medical marijuana card. Furthermore, Plaintiff was never under the influence of marijuana or any illicit drug while on duty.

39. Plaintiff informed the Residency Program Director, Dr. Amber Hoffman, about his anxiety issues in September 2020, and requested time off to address his mental health. As such, the Defendant had direct knowledge of Plaintiff's disability.

40. Upon information and belief, Plaintiff's confidential mental health treatment and reports to Dr. Hoffman during that treatment were shared with others employed by Defendant including, but not limited to, the hospitalist attending physicians who falsely claimed that Plaintiff was mentally unstable.

41.     The Defendant further regarded Plaintiff as being "mentally unstable" and therefore disabled, based on the false and misleading reports from its Hospitalists, who sent various email complaints on or about December 13, 2020.

42.     The Defendant discriminated against Plaintiff when they removed him from the residency program by placing him on leave and forcing him to complete an unwarranted drug treatment program before he could return to the program and complete his residency. Plaintiff was given the ultimatum that he participates in the drug treatment program or be terminated from the residency program.

43.     The Defendant asserts that Plaintiff was forced into the drug treatment program based on a "reasonable suspicion" that he was abusing drugs. However, this reason is pretextual. The Defendant knew Plaintiff had been prescribed medical marijuana by his psychiatrist prior to requiring that he submit to a drug test. In fact, the PRN evaluator was aware of this prescription and agreed with the recommendation of Plaintiff's psychiatrist to continue taking medical marijuana to treat his anxiety.

44.     Furthermore, the purported basis for the Defendant's "reasonable suspicion" that Plaintiff was abusing illicit drugs is false. The email reports from the various Hospitalists who expressed their opinions and allegations about Plaintiff's mental health and stability did not claim that Plaintiff was using marijuana or any illicit drugs, or that he had any sort of substance abuse problem. At most, they stated a belief that Plaintiff appeared overstimulated on "caffeine or medicine." This is further evidence of pretext.

45.     Based on the above, Plaintiff has been discriminated against in violation of the ADA, was "regarded as" disabled by the Defendant and was ultimately terminated from the pediatric residency program based upon his disability.

46.     As a direct and proximate cause of Defendant's discrimination, Plaintiff has suffered damages, including back pay, front pay, and lost benefits, as well as compensatory damages for emotional distress, mental pain and suffering, and loss of enjoyment of life. Additionally, Plaintiff has suffered a substantial interruption and delay in his residency/medical education, and damage to his medical career.

WHEREFORE, Plaintiff demands judgment against Defendant for back pay and other economic damages, front pay, compensatory damages, costs, interest, and reasonable attorney's fees, along with such other relief as this Court deems just and proper.

### Count II: Disability Discrimination in Violation
### of the Florida Civil Rights Act

47.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

48.     Plaintiff suffers from a disability as defined under the FCRA. Specifically, Plaintiff was diagnosed with anxiety, a mental and emotional impairment which substantially limits his thinking, communicating, and working, which thereby affects his ability to work and treat patients. Plaintiff is a qualified individual with a disability.

49.     At all times material to this Complaint, Plaintiff was able to perform and did perform the essential functions of his job duties as a pediatric resident, with or without reasonable accommodation. He consistently received positive performance reviews from

everyone he worked with at Nemours Children's Hospital. At all times material to this Complaint, Plaintiff was otherwise qualified to do his job.

50.     Although Plaintiff was using medical marijuana to treat his anxiety, he did so under the direction and supervision of a licensed health care professional. Plaintiff obtained a prescription and a state-approved medical marijuana card. Furthermore, Plaintiff was never under the influence of medical marijuana or any impairing or illicit drug while on duty.

51.     Plaintiff informed the Residency Program Director, Dr. Amber Hoffman, about his anxiety issues in September 2020, and requested time off to address his mental health. As such, the Defendant had direct knowledge of Plaintiff's disability.

52.     Upon information and belief, Plaintiff's confidential mental health treatment and reports to Dr. Hoffman during that treatment were shared with others employed by Defendant including, but not limited to, the hospitalist attending physicians who falsely claimed that Plaintiff was "mentally unstable" among other accusations regarding his mental health.

53.     The Defendant further regarded Plaintiff as being "mentally unstable" based on the false and misleading reports from its Hospitalists, who sent various email complaints on or about December 13, 2020.

54.     The Defendant discriminated against Plaintiff when they removed him from the residency program by placing him on unpaid leave and forcing him to complete an unwarranted drug treatment program before he could return to the program and complete his residency. Plaintiff was given the ultimatum that he participates in the drug treatment program or be terminated from the residency program.

55.     The Defendant asserts that Plaintiff was forced into the drug treatment program based on a "reasonable suspicion" that he was abusing drugs. However, this reason is pretextual. The Defendant knew Plaintiff had been prescribed medical marijuana by his psychiatrist prior to requiring that he submit to a drug test. In fact, the PRN evaluator was aware of this prescription and agreed with the recommendation of Plaintiff's psychiatrist to continue taking medical marijuana to treat his anxiety.

56.     Furthermore, the purported basis for the Defendant's "reasonable suspicion" that Plaintiff was abusing illicit drugs is false. The email reports from the various Hospitalists who expressed their concern about Plaintiff's mental health did not claim that Plaintiff was using marijuana or any illicit drugs, or that he had any sort of substance abuse problem. At most, they stated a belief that Plaintiff appeared overstimulated on "caffeine or medicine." This is further evidence of pretext.

57.     Based on the above, Plaintiff has been discriminated against in violation of the ADA, was "regarded as" disabled by the Defendant and was ultimately terminated from the pediatric residency program based upon his disability.

58.     As a direct and proximate cause of Defendant's discrimination, Plaintiff has suffered damages, including back pay, front pay, and lost benefits, as well as compensatory damages for emotional distress, mental pain and suffering, and loss of enjoyment of life. Additionally, Plaintiff has suffered a substantial interruption and delay in his residency/medical education, and potential damage to his medical career.

WHEREFORE, Plaintiff demands judgment against Defendant for back pay and other economic damages, front pay, compensatory damages, costs, interest, and reasonable attorney's fees, along with such other relief as this Court deems just and proper.

## **Count III – Breach of Contract**

59.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

60.     Plaintiff executed Graduate Medical Education Agreements ("GMEA") for both years of his residency for 2019/2020 and 2020/2021. See "Exhibit C."

61.     The GMEA provides in section 1.7 that "NCH will evaluate, through the program Director and program faculty, the educational and professional progress and achievements of Resident/fellow in accordance with ACGME requirements."

62.     ACGME requirements at Section V.A.1 under Feedback and Evaluation provides, "faculty members must directly observe, evaluate and frequently provide feedback on resident performance during each rotation or similar educational assignment."  See ACGME requirements attached hereto as "Exhibit D."

63.     Defendant breached the GMEA contract when the attending physicians who worked with Plaintiff failed to evaluate, in accordance with the ACGME requirements cited above, Plaintiff's performance on the rotation that ultimately led to Plaintiff's dismissal from the program.

64.     In fact, none of the physicians with whom Plaintiff worked on the subject rotation provided any negative feedback or correction whatsoever concerning Plaintiff's performance contrary to the ACGME requirements incorporated into the GMEA contract entered into between Plaintiff and NCH.

65.     Thus, NCH violated and breached the GMEA contract by failing to provide observation, evaluation and frequent feedback required by the contract and incorporated ACGME requirements.

66.     Plaintiff has been damaged by NCH's failure to provide any observation, evaluation and frequent feedback during the rotation in question. Had Plaintiff actually engaged in the conduct alleged by the attending physicians and hospitalists on the rotation in question, they should have provided evaluation, correction and frequent feedback instead of withholding same and ambushing Plaintiff later contrary to the requirements of the GMEA.

67.     Plaintiff has suffered damages including the loss of the remainder of his medical education and future ability to practice medicine based on Defendant's breach of contract as provided above.

WHEREFORE, Plaintiff demands judgment against Defendant for breach of contract and damages associated with such breach including but not limited to lost wages, earnings and benefits as well as the loss of his medical education and potential medical career.

**Demand for Jury Trial**

Plaintiff respectfully demands a trial by jury on all issues so triable.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 2, 2022, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send a copy to John

Lord, Esq. FOLEY & LARDNER, LLP, One Biscayne Tower, 2 South Biscayne Boulevard, Suite

1900, Miami, FL 33131-2132.

**BURRUEZO & BURRUEZO, PLLC**

*/s/ Deborah E. Frimmel, Esq.*

DEBORAH E. FRIMMEL, ESQ.
Florida Bar Number 93970
deborah@burruezolaw.com
docketing@burruezolaw.com
BURRUEZO & BURRUEZO, PLLC
911 Outer Road
Orlando, Florida 32814
Office: 407.630.6650
Facsimile: 407.754.2905

*Attorney for Plaintiff, Connor True, M.D.*

# Exhibit A

| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974.  See Privacy Act<br>Statement before completing this form. | Agency(ies)<br><br>_X_  FEPA<br>_X_  EEOC | Charge Number(s): |
|---|---|---|

| Florida Commission on Human Relations and EEOC |
|---|
| *State or local Agency, if any* |

| Name *(indicate Mr. Ms. Mrs.)*<br>Mr. Conner True, M.D. | Home Phone *(Incl. Area Code)*<br>(407) 492-9214 | Date of Birth<br>June 11, 1989 |
|---|---|---|

| Street Address<br>13865 Granger Avenue | City, State and ZIP Code<br>Orlando, Florida 32827 | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name<br>The Nemours Foundation d/b/a Nemours Children's Hospital | No. Employees, Members<br>5,000 + | Phone No. *(Include Area Code)*<br>(904) 697-4100 |
|---|---|---|
| Street Address<br>10140 Centurion Parkway North | City, State and ZIP Code<br>Jacksonville, Florida 32256 | |
| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON *(Check appropriate box(es))*<br><br>__ RACE   __ COLOR ___ SEX __ RELIGION ___NATIONAL ORIGIN<br><br>_X_ RETALIATION ___ AGE  _X_ DISABILITY ___ OTHER (Specify below.) | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest                    Latest<br>October 2020<br><br>_X_ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attached extra sheet(s))*:

I began working in the Pediatric Residency Training Program on June 17, 2019, as a Pediatric Resident at Nemours Children's Hospital ("Nemours") located in Orlando, Florida. As part of my employment, I signed a Graduate Medical Education Agreement (GMEA) for the 2019-2020 term. Prior to my second year of employment with Nemours, I signed a second GMEA for the 2020-2021 term.

During my residency, I regularly worked an average of 80-90 hours on inpatient rotations each week without any reports of issues or concerns about my performance from anyone, including my Program Director and medical supervisors, patients, patient families, and nursing and other medical staff at the hospital.

In September 2020, I found out that I had not passed one of my medical boards by a few points. I was understandably disappointed and also physically and mentally exhausted from extremely long workweeks while studying for the board exam, and I started having anxiety issues. I spoke to the Residency Program Director, Dr. Hoffman, about the anxiety and she recommended that I seek treatment from a psychiatrist and psychologist. Dr. Hoffman provided me with the names of professionals so I could reach out to them and schedule treatment.

At the recommendation of my Program Director and others as well as my counselor and psychiatrist, I took leave that was designated by Nemours as a "wellness rotation" during which I sought treatment. The "wellness rotation" was for approximately four weeks total from late September to mid-October 2020 and was the first "wellness rotation" ever used by Nemours in the pediatric residency program.  Following this treatment, I returned to work and continued to receive the same positive reviews of my performance.

After an ambulatory rotation that lasted between October and mid-November 2020 I began the inpatient rotation in mid-November.  Between mid-November and December 13, 2020, I worked 28-hour continuous shifts every four days with twelve-hour shifts in between. Despite my lack of sleep and rigorous work hours, I was continuously praised in e-mails from charge nurses, other Nemours staff, pediatric educational staff from UCF, and my attending physicians regarding my performance. During this rotation and prior, I never received any face-to-face negative feedback or any negative feedback of any sort regarding my performance.

On December 13, 2020, the last day of that month's rotation, I was arriving for my final shift which had been added at the last minute. I was called into a meeting with a Human Resources Representative, my Program Director, and two Associate Program Directors. They showed me a string of e-mails containing egregious accusations and blatant fabrications regarding my performance from hospitalist attending physicians who had previously provided extremely positive feedback.

Based on the false accusations included in the emails, it was apparent that the program had shared my private health information with those attending physicians, as they were accusing me of being "mentally unstable" "manic" and possibly "abusing stimulants or his prescription psychiatric medications." All of these accusations were entirely false. In fact, one of the attending physicians who wrote an accusatory e-mail did not even work directly with my team during that rotation and could not have known of any alleged problems with my mental stability, alleged mania, or purported potential abuse of stimulants or prescription psychiatric medications. I had never shared with any of them that I was taking any prescription psychiatric mediations.

In fact, Dr. Rebecca Gill, one of the hospitalists that wrote an accusatory e-mail, was aware that I was seeking psychiatric treatment based on discussions she had with me.

Furthermore, I was never informed of any alleged mentally unstable or manic behavior nor was I ever removed from duty for allegedly being "unable to care for patients" based on any alleged mental instability. Had the attending physicians truly believed that I was mentally unstable, manic, or abusing stimulants or prescription psychiatric mediations they would have reported it immediately and removed me from duty, which never happened.

During the December 13, 2020 meeting, none of my positive recommendations or commendations received during that same period were mentioned. My Program Director, who was reading these accusatory e-mails, had worked with me for at least one of those weeks of my rotation but had not provided any negative feedback whatsoever.

Based solely on these blatantly false e-mails, Nemours placed me on immediate leave, and I was drug tested for over thirty-five (35) possible substances. I admitted that I would likely test positive for THC, which I did, because my psychiatrist had recommended that I take marijuana for my anxiety. I had an appointment scheduled for December 21, 2020, to see a Cannabis specialist to obtain a prescription and a state-approved medical marijuana card to continue my treatment for anxiety. I received my state-approved medical marijuana card on January 5, 2021. Nevertheless, I was never under the influence of THC or any other drug while on duty and was never accused of being under the influence of marijuana while on duty or otherwise during my employment with Nemours.

On December 14, 2020 the Program Director and Assistant Program Directors telephoned me and asked me if I had an appointment with my psychiatrist yet.

Following the drug test, Nemours placed me on unpaid leave and referred me to Professional Resource Network ("PRN") for evaluation at my own expense. According to Nemours, my only other options were to resign or be terminated. I agreed to the evaluation in the interest of clearing my reputation and returning to work as a pediatric resident as soon as possible.

I underwent a rigorous drug and alcohol screening on January 18, 2021, after I had received my state-approved medical marijuana card for the prescribed use to treat my anxiety. Both my psychiatrist and the PRN evaluator advised and recommended that I continue my treatment with medical marijuana. As a result, I tested positive for THC a second time. I also underwent a telemedicine evaluation with a PRN-affiliated physician, Dr. Derek Robben on January 21, 2021.

On February 8, 2021, I received the evaluation report and referral to a PRN five (5) month in-patient treatment facility, at my own expense of approximately $25,000.00, based on alleged illicit drug abuse.  I requested a second independent (non-PRN) evaluation, but Nemours would not allow it and refused to allow me to take my case to the Board of Medicine for review.

As a result, I have been on leave since December 24, 2020. I have incurred severe financial loss, possible loss of my medical career, delay in my residency and additional anxiety based on the discriminatory decisions of Nemours. The decision to place me on unpaid leave and drug test me was based solely on the information provided by physicians that knew of my treatment by a psychiatrist, my "wellness rotation" related to that treatment, and my diagnosis of an anxiety condition. They, in turn, used this information to accuse me of being mentally unstable, manic, and abusing stimulants and psychiatric medication.

At the very least, these physicians, the Program Directors, Assistant Program Directors, and Human Resources Representative "regarded" me as disabled due to my medical condition and retaliated against me for requesting a reasonable accommodation (taking leave for purposes of treatment) and for taking "wellness rotation" leave. Furthermore, had the program not improperly shared my confidential, protected health information with other physicians at Nemours, I would not have been subjected to the false and defamatory accusations regarding my mental stability.

I am an individual with a disability, anxiety disorder, as recognized under the ADA. Nemours also regarded me as disabled due to my anxiety condition. I am also a qualified person under the ADA because I could perform the essential functions of my position, as a Pediatric Resident. I was subject to unlawful discrimination because of my disability when I was placed on indefinite leave, forced to submit to drug testing, and given an ultimatum to either submit to PRN in-patient treatment at my own expense, resign, or be terminated.

I believe I was discriminated against based on my disability and/or based on being regarded as having a disability, in violation of The Americans with Disabilities Act, 42 U.S.C. § 12112(a), as amended, and the Florida Civil Rights Act of 1992, §760.01, Fla. Stat. et seq.

| | |
|---|---|
| I want this charge filed with the EEOC, Florida Commission on Human Relations, and the local Agency, if any.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br><br>Jun 14, 2021  *Conner True (Jun 14, 2021 16:24 EDT)*<br>_____  _____<br>*Date*          *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT<br><br><br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC FORM 5 (REV. 3/01)
4851-6205-4124, v. 1

Exhibit B

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Connor True**<br>**13865 Granger Avenue**<br>**Orlando, FL 32827** | From: | **San Juan Local Office**<br>**525 F D Roosevelt Ave**<br>**1202 Plaza Las Americas**<br>**San Juan, PR 00918** |
|---|---|---|---|

|  | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **515-2021-00242** | **Luis Calzada,**<br>**Investigator** | **(787) 520-5624** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

|  | More than 180 days have passed since the filing of this charge. |
|---|---|
| **X** | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| **X** | The EEOC is terminating its processing of this charge. |
|  | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

|  | The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost. |
|---|---|
|  | The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally signed by William R. Sanchez
Date: 2021.11.23 11:12:49 -04'00'

**November 23, 2021**

Enclosures(s)

**William R. Sanchez,**
**Local Office Director**

*(Date Issued)*

cc:

| **John (Jack) Lord Jr., Esq.**<br>**FOLEY & LARDER, LLP**<br>**10140 Centurion Parkway North**<br>**Jacksonville, FL 32256** | **BURRUEZO WORKPLACE LAW**<br>**ATTN: Stoodley, Lara**<br>**911 Outer Road**<br>**Orlando, FL 32814** |
|---|---|

Enclosure with EEOC
Form 161-B (11/2020)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.  *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

  ➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
  ➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)),  **"major life activities"  now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**
  ➢ **Only one** major life activity need be substantially limited.
  ➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
  ➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
  ➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**
  ➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
  ➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
  ➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
  ➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

Exhibit C



Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**2019-2020
GRADUATE MEDICAL EDUCATION
AGREEMENT**

**Department: Department of Pediatrics**

**Program: Pediatric Residency Training Program**

This Graduate Medical Education Agreement (the "Agreement") is between Nemours Children's Hospital of The Nemours Foundation, a Florida not-for-profit corporation ("NCH"), and Conner C. True ("Resident" or "Fellow") NCH wishes to appoint the Resident/Fellow as a PGY 1 in the Pediatric Residency Training Program ("Program") and the Resident/Fellow wishes to accept such appointment.  Unless earlier terminated in accordance with this Agreement, the term of the Resident/Fellow appointment (the "Appointment Period") commences on June 17, 2019, ("Commencement Date") and terminates on June 30, 2020 ("Termination Date").

Therefore the parties hereto agree as follows:

**I.      NCH RESPONSIBILITIES**

NCH shall:

1.      <u>Compensate Resident/Fellow</u>.  The annual stipend shall be sixty five thousand dollars ($65,000.00), paid bi-weekly.   The stipend is subject to all deductions required by applicable federal or state law and such deductions as authorized by Resident in accordance with NCH standard practices.

2.      <u>Benefits and Resident/Fellow Services</u>.  In addition to the specified stipend, NCH agrees to provide to Resident/Fellow, for the term of this Agreement, benefits in accordance with NCH policies and procedures applicable to residents/fellows.  Detailed information regarding NCH's policies on Hospital and Health Insurance for Resident/Fellow and Resident's/Fellow's eligible dependents, Life Insurance, Short & Long Long-Term Disability, Paid Leave and other Leaves of Absence (e.g., vacation, parental, sick, and other leave(s)), FMLA, Accommodations for Disabilities, Counseling, Medical and Behavioral Health Support Services, Physician Impairment, and library privileges can be found in the GME Handbook or through NCH's Office for Graduate Medical Education.  This list is not intended to be exclusive of other benefits which may be in existence, and NCH, at its sole discretion, reserves the right to amend or alter such policies or substitute benefits applicable to residents/fellows from time to time during the Appointment Period.

3.      <u>Provide Professional Liability Coverage</u>.  NCH shall provide Resident/Fellow with professional liability insurance coverage while Resident/Fellow is acting within the scope of his/her assigned Program activities, of no less than Two Hundred, Fifty Thousand Dollars ($250,000) per occurrence and Seven Hundred, Fifty Thousand Dollars in the annual aggregate ($750,000).  Coverage shall be on an occurrence basis, or if coverage is provided through a claims-made policy, NCH shall provide Resident/Fellow with "tail" coverage.  Coverage shall provide legal defense and protection against awards from claims reported or filed after the completion of the Program if the alleged acts or omissions of Resident/Fellow are within the scope of the Program. NCH may provide such coverage through a program of self-insurance.  Resident/Fellow agrees to cooperate fully in any investigations, discovery, and defense that arise.

Nemours. Children's Hospital

Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

4.      Perform Pre Commencement Screening.  Prior to the Commencement Date specified in this Agreement, NCH will perform a background check of Resident/Fellow and a check of the excluded provider database, pursuant to the policies of NCH, and will require proof of all required vaccinations and immunizations. NCH will provide Residents/Fellows with required health screening(s).  Resident/Fellow's failure to pass any of the above-described checks or failure to provide proof of required immunizations, vaccinations, or required health screening may result in termination of this Agreement.

5.      Clinical and Educational Work Hours (Duty Hours).   NCH will maintain substantial compliance with institutional and program level ACGME clinical and educational work hour requirements. (See "Duty Hours, Moonlighting, and Work Environment" Policy).

6.      Supervision.  NCH will provide Residents/Fellow with appropriate and adequate supervision for educational and clinical activities in accordance with ACGME requirements.

7.      Evaluation.  NCH will evaluate, through the Program Director and Program faculty, the educational and professional progress and achievement of Resident/Fellow in accordance with ACGME requirements.

## II.      RESIDENT/FELLOW RESPONSIBILITIES

Resident/Fellow shall:

1.      Credentialing and Pre-Commencement Documentation.  As a condition precedent to appointment, Resident/Fellow must provide all required credentialing and pre-commencement documentation to NCH prior to the Commencement Date. This Agreement may be declared a nullity by NCH and shall not become effective if Resident/Fellow fails to provide NCH with all credentialing and pre-commencement documentation required for certification of eligibility.

2.      Licensure and Visa Status.  Resident/Fellow must apply for, obtain and continuously maintain a current and valid Florida medical training license or a Florida unrestricted medical license. Any Resident/Fellow who does not possess a current and valid Florida license will not be permitted to participate in any patient care activities or any activities associated with the delivery of patient care.  Resident understands and acknowledges that failure to obtain and maintain current medical licensure may result in suspension without pay until the license is current or may result in termination of this Agreement.

If Resident/Fellow is not a United States citizen, Resident/Fellow must obtain and show proof of visa status consistent with undertaking and fulfilling the obligations of this Agreement. Further, Resident/Fellow authorizes NCH to solicit and/or obtain verification of such status from third parties. Failure to possess such proof by the Commencement Date of this Agreement may delay the start date without pay in the interim and may serve to terminate this Agreement without the provision of due process. The provisions of this paragraph shall survive the expiration, termination or nonrenewal of this agreement. Resident/Fellow must have a valid United States social security number prior to Commencement date of this Agreement.

Nemours. Children's Hospital

Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

3.      Participate in Pre Commencement Screening & Training Verification.  All Residents/Fellows must provide, prior to commencement of this Agreement, all documentation to verify previous educational training, including the final evaluation letters and milestone evaluations from all previous training programs. Resident/Fellow must pass a required background check; pass a drug/controlled substances test; complete a conflict of interest check; provide proof of all required vaccinations and immunizations; and provide acceptable proof that Resident/Fellow is eligible to be legally employed in the United States in accordance with the 1986 Immigration Act.  Resident/Fellow further authorizes NCH to perform a background check and a check of the excluded provider database consistent with its internal policies. Resident/Fellow must also undergo all required health screening(s) or provide proof of such health screening(s) on or prior to the Commencement Date specified in this Agreement.

4.      Provide Timely Notifications. Resident/Fellow must notify the Program Director and the Office of Graduate Medical Education in writing immediately if the Resident/Fellow's medical license is under investigation or has been revoked, suspended or otherwise restricted or if an application for a temporary or permanent license is denied. Resident/Fellow must notify the Program Director, the Office of Graduate Medical Education, and the Compliance Director in writing immediately if the Resident/Fellow is or becomes ineligible to participate in, or is suspended or excluded from, the Medicare, Medicaid or other governmental payment program.  Any such revocation, suspension, restriction, denial, ineligibility or exclusion shall serve automatically to terminate this Agreement. The Resident/Fellow must immediately notify NCH of any professional liability or other claim made or threatened against him/her related to the provision of services as part of clinical training, as well as an incident required to be reported pursuant to NCH's or affiliated hospital's reporting policies.

5.      Abide by Applicable Policies.  Resident/Fellow must read, become familiar with and continuously comply with all applicable policies, procedures, and standards of behavior, of NCH and the respective Program; the guidelines established by applicable regulatory or accrediting agencies, including, without limitation, the ACGME requirements for duty hour standards; and all applicable laws and regulations, including, without limitation, HIPAA and OSHA standards for the prevention of transmission of blood borne pathogens.  Likewise, the Resident/Fellow shall obey and adhere to the corresponding policies of all the facilities to which he or she rotates (collectively "participating institutions"). Resident/Fellow also agrees to obey and adhere to any other relevant rules or regulations imposed by accrediting, certifying, or licensing organizations.  Resident/Fellow must complete all training required by NCH or institutional GME Committee. Failure to complete such training may result in disciplinary action.

6.      Clinical and Educational Work Hours (Duty Hours) and Moonlighting.   Resident/Fellow shall perform his/her duties under this Agreement during such hours as the Program Director may direct and agrees to maintain substantial compliance with ACGME clinical and educational work hour requirements.  Resident/Fellow shall adhere to the NCH "Duty Hours, Moonlighting, and Work Environment" Policy.

Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**Nemours. Children's Hospital**

7.     Complete Medical Records.  Resident/Fellow must complete medical records as set forth in applicable institutional policies and Medical Staff Rules and Regulations of the institution where the resident is working. Failure to complete medical records in a timely fashion in accordance with those policies may result in disciplinary action. Disciplinary action taken for failure to complete medical records in a timely fashion is not subject to review under the Grievance Procedure described in this Agreement.  Nemours is the record owner of all Medical Records generated by Resident/Fellow.

8.     Clinical Services.  Provide clinical services: (i) commensurate with his/her level of advancement and responsibilities; (ii) under appropriate supervision; (iii) at sites specifically approved by the Program; and (iv) under circumstances and at locations covered by NCH's professional liability insurance maintained for Resident/Fellow in accordance with this Agreement.

9.     Release of Information.  Resident agrees that NCH may obtain from and provide to all proper parties any and all information that may be required or authorized by law or by any accreditation body.   Resident/Fellow further covenants not to sue either NCH, its officers, directors, or other personnel for doing so. This covenant shall survive termination or expiration of this Agreement.

Failure to comply with any of the provisions of this Section II governing "Resident/Fellow Responsibilities" may constitute grounds for disciplinary action (see Section V).

## III.     PROHIBITION ON DISCRIMINATION AND HARASSMENT

It is the policy of NCH to maintain a work environment free from discrimination, harassment, or intimidation on account of sex, age, ethnicity, race, or disability. NCH has established procedures for investigating and responding to claims of discrimination and harassment.  If Resident/Fellow believes he/she has been subjected to discrimination or harassment Resident/Fellow should report the alleged act immediately. If an investigation discloses that Resident/Fellow has discriminated against or harassed any other employee, patient/family, or student of the hospitals or an affiliated hospital, Resident/Fellow shall be subject to appropriate disciplinary action up to and including termination from the Program.

## IV.     PROMOTION/APPOINTMENT RENEWAL, CORRECTIVE/DISCIPLINARY ACTION, AND TERMINATION

1.     Board Eligibility.  Resident/Fellow acknowledges that the Program is a 3-year obligation, and after the successful completion of the Program, the Resident/Fellow will be eligible for board certification by the American Board for Pediatrics (See https://www.abp.org/) for more information about Board examinations and eligibility requirements for new candidates.   Resident/Fellow expressly acknowledges that additional training after a leave of absence may be necessary to successfully complete Program Requirements and/or meet eligibility requirements for Board certification. Failure to complete such additional training may impact Resident/Fellow's ability to satisfy Program requirements and board eligibility.

2.     Reappointment and Promotion.  Reappointment and promotion are at the discretion of NCH and are contingent upon factors, including, but not limited to, satisfactory performance; compliance with the terms of this Agreement; and continuation by ACGME of institutional and program accreditation.   NCH will use its best efforts to notify

Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

Resident/Fellow as soon as practicable prior to the expiration of the current term of the Agreement regarding renewal or non-renewal of this Agreement and, if renewed, the term of such renewal.  Resident/Fellow understands and acknowledges that nothing herein shall be construed to confer upon Resident/Fellow an automatic right to promotion or renewal of this Agreement for a subsequent residency/fellowship year or part thereof.

4.      Program Closure or Reduction.  In the event of a closure or reduction in size of a training program, the NCH's "Residency Training Program Closure/Reduction Policy" will be followed.

5.      Corrective/Disciplinary Action.  During the term of this Agreement, Resident's/Fellow's appointment is expressly conditioned upon satisfactory performance of all Program elements by Resident/Fellow. If the actions, conduct, or performance of Resident/Fellow are deemed by the Program Director to be inconsistent with the terms of this Agreement, NCH's or participating institutions' standards of patient care, patient welfare, or the objectives of NCH, or if such actions, conduct, or performance reflects adversely on the Program or NCH or the participating institutions, or disrupts operations at the Program or NCH or the participating institutions, corrective action, including, but not limited to, suspension and termination, may be taken by the Program Director in accordance with the "Disciplinary Actions" Policy.

6.      Termination of Agreement.  This Agreement may be terminated at any time by the mutual written agreement of both parties.  In addition to the provisions of Articles I, II, III, and IV, NCH shall have the right to immediately terminate this Agreement upon the occurrence of any of the following: Resident/Fellow's license to practice medicine is terminated or suspended; Resident/Fellow is, or becomes, ineligible to participate in the Medicare, Medicaid or other governmental payment programs; in the case of a Resident/Fellow who is not a U.S. Citizen, suspension or loss of a visa status consistent with the provision of services pursuant to this Agreement; non-renewal of appointment or non-promotion. Upon termination of this Agreement, the obligations of NCH under this Agreement shall cease. If Resident/Fellow's appointment is terminated, the Program Director shall determine the extent of credit earned by Resident/Fellow. The Program Director shall document a final performance evaluation to indicate credit earned during the course of training.

**V.      GRIEVANCE AND DUE PROCESS**

Resident/Fellow agrees to comply with NCH's "General Grievances Policy" for submitting and processing Resident/Fellow unresolved grievances.  Resident shall be only be entitled to appeal rights and procedures accorded to residents/fellows as set forth in the "Appeal of Disciplinary Action Policy" to address actions taken during the appointment period, including suspension, non-renewal, non-promotion, or termination.  Resident/Fellow acknowledges that under no circumstances shall he/she be entitled to the hearing appellate rights granted to physician members of the Medical Staff as described in NCH's Medical Staff Bylaws.  Neither the conflict resolution nor corrective action procedures set forth in the Medical Staff Bylaws, nor any human resources policies of NCH or affiliated hospitals pertaining to grievances, appeals, performance management, corrective action, or termination, shall apply to Resident/Fellow.

Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**Nemours.** Children's Hospital

## VI.    MISCELLANEOUS

1.    <u>Governing Law.</u>  This Agreement shall be construed in accordance with Florida law, and the forum for any disputes arising hereunder shall be the circuit courts of Orange County, Florida.

2.    <u>Entire Agreement</u>.  This Agreement, and attachments and amendments thereto, contains the entire agreement and understanding between the parties and supersedes any prior agreement(s) relating to the subject matter hereof, and may be modified only by a written instrument duly authorized and executed by both parties or as provided herein.

3.    <u>Notices</u>.  Any notices related to this Agreement shall be deemed proper if given in writing and hand delivered, sent via a reliable express or overnight delivery carrier, such as Federal Express, or mailed, registered or certified mail return receipt requested, with all postage or other charges prepaid and addressed as follows:

      If to NCH:
**Office of Graduate Medical Education**
**ATTN: Tiffany Baulkman**
**13535 Nemours Parkway**
**Orlando, FL 32827**

      If to Resident/Fellow:
**Conner C. True**
**613 Ridgewood Drive**
**Windermere, FL 34786**

4.    <u>Waiver</u>.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach.

5.    <u>Severability</u>.  In the event any provision of this Agreement is held to be unenforceable for any reason, that unenforceability shall not affect the remainder of this Agreement, which shall remain in full force and effect and shall be enforceable in accordance with its terms.



Graduate Medical Education
13535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

6.    <u>OBRA</u>.  In accordance with Section 952 of the Omnibus Reconciliation Act of 1980 (PL 96-499), Resident/Fellow agrees to make available for a period of four (4) years following completion of the term of this Agreement, upon request of the Secretary of Health and Human Services of the United States or of the United States Comptroller General or any of their authorized agents, all books, documents and records necessary to certify the nature and extent of the cost of the services rendered pursuant to this Agreement as required by federal statute or duly promulgated regulations.

**THE NEMOURS FOUNDATION**                                              **RESIDENT/FELLOW**

_____                                     _____
**Amber Hoffman, MD, FAAP**                                          **Conner C. True**
Pediatric Residency Program Director

Date: _____                                   Date: _____

_____
**Heather Fagan, MD, MS, FAAP**
Designated Institutional Official

Date: _____



Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**2020-2021**
**GRADUATE MEDICAL EDUCATION**
**AGREEMENT**

**Department: Department of Pediatrics**

**Program: Pediatric Residency Training Program**

This Graduate Medical Education Agreement (the "Agreement") is between Nemours Children's Hospital of The Nemours Foundation, a Florida not-for-profit corporation ("NCH"), and Conner True, MD ("Resident" or "Fellow") NCH wishes to appoint the Resident/Fellow as a PGY 2 in the Pediatric Residency Training Program ("Program") and the Resident/Fellow wishes to accept such appointment.  Unless earlier terminated in accordance with this Agreement, the term of the Resident/Fellow appointment (the "Appointment Period") commences on July 1, 2020, ("Commencement Date") and terminates on June 30, 2021 ("Termination Date").

Therefore the parties hereto agree as follows:

**I.      NCH RESPONSIBILITIES**

NCH shall:

1.       <u>Compensate Resident/Fellow</u>. The annual stipend shall be sixty seven thousand and five hundred dollars ($67,500.00), paid bi-weekly.   The stipend is subject to all deductions required by applicable federal or state law and such deductions as authorized by Resident in accordance with NCH standard practices.

2.       <u>Benefits and Resident/Fellow Services</u>.  In addition to the specified stipend, NCH agrees to provide to Resident/Fellow, for the term of this Agreement, benefits in accordance with NCH policies and procedures applicable to residents/fellows. Detailed information regarding NCH's policies on Hospital and Health Insurance for Resident/Fellow and Resident's/Fellow's eligible dependents, Life Insurance, Short & Long Long-Term Disability, Paid Leave and other Leaves of Absence (e.g., vacation, parental, sick, and other leave(s)), FMLA, Accommodations for Disabilities, Counseling, Medical and Behavioral Health Support Services, Physician Impairment, and library privileges can be found in the GME Handbook or through NCH's Office for Graduate Medical Education. This list is not intended to be exclusive of other benefits which may be in existence, and NCH, at its sole discretion, reserves the right to amend or alter such policies or substitute benefits applicable to residents/fellows from time to time during the Appointment Period.

3.       <u>Provide Professional Liability Coverage</u>. NCH shall provide Resident/Fellow with professional liability insurance coverage while Resident/Fellow is acting within the scope of his/her assigned Program activities, of no less than Two Hundred, Fifty Thousand Dollars ($250,000) per occurrence and Seven Hundred, Fifty Thousand Dollars in the annual aggregate ($750,000). Coverage shall be on an occurrence basis, or if coverage is provided through a claims-made policy, NCH shall provide Resident/Fellow with "tail" coverage.  Coverage shall provide legal defense and protection against awards from claims reported or filed after the completion of the Program if the alleged acts or omissions of Resident/Fellow are within the scope of the Program. NCH may provide such coverage through a program of self-insurance.  Resident/Fellow agrees to cooperate fully in any investigations, discovery, and defense that arise.

Nemours. Children's Hospital

Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

4.     Clinical and Educational Work Hours (Duty Hours).   NCH will maintain substantial compliance with institutional and program level ACGME clinical and educational work hour requirements. (See "Duty Hours, Moonlighting, and Work Environment" Policy).

5.     Supervision. NCH will provide Residents/Fellow with appropriate and adequate supervision for educational and clinical activities in accordance with ACGME requirements.

6.     Evaluation.  NCH will evaluate, through the Program Director and Program faculty, the educational and professional progress and achievement of Resident/Fellow in accordance with ACGME requirements.

**II.     RESIDENT/FELLOW RESPONSIBILITIES**

Resident/Fellow shall:

1.     Credentialing and Pre-Commencement Documentation.  As a condition precedent to appointment, Resident/Fellow must provide all required credentialing and pre-commencement documentation to NCH prior to the Commencement Date. This Agreement may be declared a nullity by NCH and shall not become effective if Resident/Fellow fails to provide NCH with all credentialing and pre-commencement documentation required for certification of eligibility.

2.     Licensure and Visa Status. Resident/Fellow must apply for, obtain and continuously maintain a current and valid Florida medical training license or a Florida unrestricted medical license. Any Resident/Fellow who does not possess a current and valid Florida license will not be permitted to participate in any patient care activities or any activities associated with the delivery of patient care.  Resident understands and acknowledges that failure to obtain and maintain current medical licensure may result in suspension without pay until the license is current or may result in termination of this Agreement.

If Resident/Fellow is not a United States citizen, Resident/Fellow must obtain and show proof of visa status consistent with undertaking and fulfilling the obligations of this Agreement. Further, Resident/Fellow authorizes NCH to solicit and/or obtain verification of such status from third parties. Failure to possess such proof by the Commencement Date of this Agreement may delay the start date without pay in the interim and may serve to terminate this Agreement without the provision of due process. The provisions of this paragraph shall survive the expiration, termination or nonrenewal of this agreement. Resident/Fellow must have a valid United States social security number prior to Commencement date of this Agreement.

Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**Nemours. Children's Hospital**

3.	Provide Timely Notifications. Resident/Fellow must notify the Program Director and the Office of Graduate Medical Education in writing immediately if the Resident/Fellow's medical license is under investigation or has been revoked, suspended or otherwise restricted or if an application for a temporary or permanent license is denied. Resident/Fellow must notify the Program Director, the Office of Graduate Medical Education, and the Compliance Director in writing immediately if the Resident/Fellow is or becomes ineligible to participate in, or is suspended or excluded from, the Medicare, Medicaid or other governmental payment program. Any such revocation, suspension, restriction, denial, ineligibility or exclusion shall serve automatically to terminate this Agreement. The Resident/Fellow must immediately notify NCH of any professional liability or other claim made or threatened against him/her related to the provision of services as part of clinical training, as well as an incident required to be reported pursuant to NCH's or affiliated hospital's reporting policies.

4.	 Abide by Applicable Policies.  Resident/Fellow must read, become familiar with and continuously comply with all applicable policies, procedures, and standards of behavior, of NCH and the respective Program; the guidelines established by applicable regulatory or accrediting agencies, including, without limitation, the ACGME requirements for duty hour standards; and all applicable laws and regulations, including, without limitation, HIPAA and OSHA standards for the prevention of transmission of blood borne pathogens. Likewise, the Resident/Fellow shall obey and adhere to the corresponding policies of all the facilities to which he or she rotates (collectively "participating institutions"). Resident/Fellow also agrees to obey and adhere to any other relevant rules or regulations imposed by accrediting, certifying, or licensing organizations.  Resident/Fellow must complete all training required by NCH or institutional GME Committee. Failure to complete such training may result in disciplinary action.

5.	Clinical and Educational Work Hours (Duty Hours) and Moonlighting.  Resident/Fellow shall perform his/her duties under this Agreement during such hours as the Program Director may direct and agrees to maintain substantial compliance with ACGME clinical and educational work hour requirements.  Resident/Fellow shall adhere to the NCH "Duty Hours, Moonlighting, and Work Environment" Policy.

6.	Complete Medical Records. Resident/Fellow must complete medical records as set forth in applicable institutional policies and Medical Staff Rules and Regulations of the institution where the resident is working. Failure to complete medical records in a timely fashion in accordance with those policies may result in disciplinary action. Disciplinary action taken for failure to complete medical records in a timely fashion is not subject to review under the Grievance Procedure described in this Agreement. Nemours is the record owner of all Medical Records generated by Resident/Fellow.

7.	Clinical Services. Provide clinical services: (i) commensurate with his/her level of advancement and responsibilities; (ii) under appropriate supervision; (iii) at sites specifically approved by the Program; and (iv) under circumstances and at locations covered by NCH's professional liability insurance maintained for Resident/Fellow in accordance with this Agreement.

Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**Nemours.** Children's Hospital

8.      Release of Information.  Resident agrees that NCH may obtain from and provide to all proper parties any and all information that may be required or authorized by law or by any accreditation body.  Resident/Fellow further covenants not to sue either NCH, its officers, directors, or other personnel for doing so. This covenant shall survive termination or expiration of this Agreement.

Failure to comply with any of the provisions of this Section II governing "Resident/Fellow Responsibilities" may constitute grounds for disciplinary action (see Section V).

### III.      PROHIBITION ON DISCRIMINATION AND HARASSMENT

It is the policy of NCH to maintain a work environment free from unlawful discrimination based on an Associate's race, color, marital status, sex, sexual orientation, gender identity, genetic information, age, religion, national origin, ancestry, disability, veteran's status, military leave, or other characteristics or classifications protected by applicable federal, state, or local law (Protected Classifications). NCH has established procedures for investigating and responding to claims of discrimination and harassment. If Resident/Fellow believes he/she has been subjected to discrimination or harassment Resident/Fellow should report the alleged act immediately. If an investigation discloses that Resident/Fellow has discriminated against or harassed any other employee, patient/family, or student of the hospitals or an affiliated hospital, Resident/Fellow shall be subject to appropriate disciplinary action up to and including termination from the Program.

### IV.      PROMOTION/APPOINTMENT RENEWAL, CORRECTIVE/DISCIPLINARY ACTION, AND TERMINATION

1.      Board Eligibility.  Resident/Fellow acknowledges that the Program is a 3-year obligation, and after the successful completion of the Program, the Resident/Fellow will be eligible for board certification by the American Board for Pediatrics (See https://www.abp.org/) for more information about Board examinations and eligibility requirements for new candidates.   Resident/Fellow expressly acknowledges that additional training after a leave of absence may be necessary to successfully complete Program Requirements and/or meet eligibility requirements for Board certification. Failure to complete such additional training may impact Resident/Fellow's ability to satisfy Program requirements and board eligibility.

2.      Reappointment and Promotion.  Reappointment and promotion are at the discretion of NCH and are contingent upon factors, including, but not limited to, satisfactory performance; compliance with the terms of this Agreement; and continuation by ACGME of institutional and program accreditation.  NCH will use its best efforts to notify Resident/Fellow as soon as practicable prior to the expiration of the current term of the Agreement regarding renewal or non-renewal of this Agreement and, if renewed, the term of such renewal. Resident/Fellow understands and acknowledges that nothing herein shall be construed to confer upon Resident/Fellow an automatic right to promotion or renewal of this Agreement for a subsequent residency/fellowship year or part thereof.

4.      Program Closure or Reduction. In the event of a closure or reduction in size of a training program, the NCH's "Residency Training Program Closure/Reduction Policy" will be followed.

Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

**Nemours.** **Children's Hospital**

5.      Corrective/Disciplinary Action. During the term of this Agreement, Resident's/Fellow's appointment is expressly conditioned upon satisfactory performance of all Program elements by Resident/Fellow. If the actions, conduct, or performance of Resident/Fellow are deemed by the Program Director to be inconsistent with the terms of this Agreement, NCH's or participating institutions' standards of patient care, patient welfare, or the objectives of NCH, or if such actions, conduct, or performance reflects adversely on the Program or NCH or the participating institutions, or disrupts operations at the Program or NCH or the participating institutions, corrective action, including, but not limited to, suspension and termination, may be taken by the Program Director in accordance with the "Disciplinary Actions" Policy.

6.      Termination of Agreement. This Agreement may be terminated at any time by the mutual written agreement of both parties. In addition to the provisions of Articles I, II, III, and IV, NCH shall have the right to immediately terminate this Agreement upon the occurrence of any of the following: Resident/Fellow's license to practice medicine is terminated or suspended; Resident/Fellow is, or becomes, ineligible to participate in the Medicare, Medicaid or other governmental payment programs; in the case of a Resident/Fellow who is not a U.S. Citizen, suspension or loss of a visa status consistent with the provision of services pursuant to this Agreement; non-renewal of appointment or non-promotion. Upon termination of this Agreement, the obligations of NCH under this Agreement shall cease. If Resident/Fellow's appointment is terminated, the Program Director shall determine the extent of credit earned by Resident/Fellow. The Program Director shall document a final performance evaluation to indicate credit earned during the course of training.

## V.      GRIEVANCE AND DUE PROCESS

Resident/Fellow agrees to comply with NCH's "General Grievances Policy" for submitting and processing Resident/Fellow unresolved grievances.  Resident shall be only be entitled to appeal rights and procedures accorded to residents/fellows as set forth in the "Appeal of Disciplinary Action Policy" to address actions taken during the appointment period, including suspension, non-renewal, non-promotion, or termination.  Resident/Fellow acknowledges that under no circumstances shall he/she be entitled to the hearing appellate rights granted to physician members of the Medical Staff as described in NCH's Medical Staff Bylaws.  Neither the conflict resolution nor corrective action procedures set forth in the Medical Staff Bylaws, nor any human resources policies of NCH or affiliated hospitals pertaining to grievances, appeals, performance management, corrective action, or termination, shall apply to Resident/Fellow.

Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

## VI.  MISCELLANEOUS

1.    <u>Governing Law.</u>  This Agreement shall be construed in accordance with Florida law, and the forum for any disputes arising hereunder shall be the circuit courts of Orange County, Florida.

2.    <u>Entire Agreement.</u> This Agreement, and attachments and amendments thereto, contains the entire agreement and understanding between the parties and supersedes any prior agreement(s) relating to the subject matter hereof, and may be modified only by a written instrument duly authorized and executed by both parties or as provided herein.

3.    <u>Notices.</u>  Any notices related to this Agreement shall be deemed proper if given in writing and hand delivered, sent via a reliable express or overnight delivery carrier, such as Federal Express, or mailed, registered or certified mail return receipt requested, with all postage or other charges prepaid and addressed as follows:

> If to NCH:
> **Office of Graduate Medical Education**
> **ATTN: Tiffany Baulkman**
> **13535 Nemours Parkway**
> **Orlando, FL 32827**
>
> If to Resident/Fellow:
> **Conner True, MD**
> **13865 Granger Ave**
> **Orlando, FL 32827**

4.    <u>Waiver.</u>  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach.

5.    <u>Severability.</u>  In the event any provision of this Agreement is held to be unenforceable for any reason, that unenforceability shall not affect the remainder of this Agreement, which shall remain in full force and effect and shall be enforceable in accordance with its terms.



Graduate Medical Education
6535 Nemours Parkway
Orlando, FL 32827
Phone: (407) 567-3224
Fax (407) 650-7082

6.      <u>OBRA</u>.  In accordance with Section 952 of the Omnibus Reconciliation Act of 1980 (PL 96-499), Resident/Fellow agrees to make available for a period of four (4) years following completion of the term of this Agreement, upon request of the Secretary of Health and Human Services of the United States or of the United States Comptroller General or any of their authorized agents, all books, documents and records necessary to certify the nature and extent of the cost of the services rendered pursuant to this Agreement as required by federal statute or duly promulgated regulations.

**THE NEMOURS FOUNDATION**                                               **RESIDENT/FELLOW**

_____                              _____
**Amber Hoffman, MD, FAAP** Pediatric                          **Conner True, MD**
Residency Program Director

Date: _____                          Date: _____

_____
**Heather Fagan, MD, MS, FAAP**
Designated Institutional Official

Date: _____

Exhibit D



**Accreditation Council for
Graduate Medical Education**

# ACGME
# Common Program Requirements (Residency)

ACGME-approved focused revision: February 3, 2020; effective July 1, 2020

Editorial Revision, effective July 1, 2021: Background and Intent below VI.A.2.b) revised; substance use disorder language updated; further specification note under VI.A.2.c).(1).(b) updated

## Common Program Requirements (Residency) Contents

Introduction ..................................................................................................................... 3
Int.A.      Preamble .......................................................................................................... 3
Int.B.      Definition of Specialty ...................................................................................... 3
Int.C.      Length of Educational Program ........................................................................ 3
I.      Oversight .................................................................................................................. 4
I.A.        Sponsoring Institution ...................................................................................... 4
I.B.        Participating Sites ............................................................................................. 4
I.C.        Recruitment ...................................................................................................... 5
I.D.        Resources ......................................................................................................... 5
I.E.        Other Learners and Other Care Providers ........................................................ 7
II.     Personnel ................................................................................................................. 7
II.A.       Program Director .............................................................................................. 7
II.B.       Faculty ............................................................................................................ 11
II.C.       Program Coordinator ...................................................................................... 14
II.D.       Other Program Personnel ............................................................................... 15
III.    Resident Appointments .......................................................................................... 15
III.A.      Eligibility Requirements .................................................................................. 16
III.B.      Number of Residents ...................................................................................... 17
III.C.      Resident Transfers ......................................................................................... 18
IV.     Educational Program .............................................................................................. 18
IV.A.       Curriculum Components .................................................................................. 18
IV.B.       ACGME Competencies .................................................................................... 19
IV.C.       Curriculum Organization and Resident Experiences ...................................... 24
IV.D.       Scholarship ..................................................................................................... 24
V.      Evaluation ............................................................................................................... 26
V.A.        Resident Evaluation ........................................................................................ 27
V.B.        Faculty Evaluation .......................................................................................... 30
V.C.        Program Evaluation and Improvement ............................................................ 31
VI.     The Learning and Working Environment ................................................................ 35
VI.A.       Patient Safety, Quality Improvement, Supervision, and Accountability ........... 36
VI.B.       Professionalism ............................................................................................... 41
VI.C.       Well-Being ...................................................................................................... 43
VI.D.       Fatigue Mitigation .......................................................................................... 47
VI.E.       Clinical Responsibilities, Teamwork, and Transitions of Care ........................ 47
VI.F.       Clinical Experience and Education .................................................................. 48

### Common Program Requirements (Residency)

Where applicable, text in italics describes the underlying philosophy of the requirements in that section. These philosophic statements are not program requirements and are therefore not citable.

Note: Review Committees may further specify only where indicated by "The Review Committee may/must further specify."

### Introduction

Int.A.     *Graduate medical education is the crucial step of professional development between medical school and autonomous clinical practice. It is in this vital phase of the continuum of medical education that residents learn to provide optimal patient care under the supervision of faculty members who not only instruct, but serve as role models of excellence, compassion, professionalism, and scholarship.*

*Graduate medical education transforms medical students into physician scholars who care for the patient, family, and a diverse community; create and integrate new knowledge into practice; and educate future generations of physicians to serve the public. Practice patterns established during graduate medical education persist many years later.*

*Graduate medical education has as a core tenet the graded authority and responsibility for patient care. The care of patients is undertaken with appropriate faculty supervision and conditional independence, allowing residents to attain the knowledge, skills, attitudes, and empathy required for autonomous practice. Graduate medical education develops physicians who focus on excellence in delivery of safe, equitable, affordable, quality care; and the health of the populations they serve. Graduate medical education values the strength that a diverse group of physicians brings to medical care.*

*Graduate medical education occurs in clinical settings that establish the foundation for practice-based and lifelong learning. The professional development of the physician, begun in medical school, continues through faculty modeling of the effacement of self-interest in a humanistic environment that emphasizes joy in curiosity, problem-solving, academic rigor, and discovery. This transformation is often physically, emotionally, and intellectually demanding and occurs in a variety of clinical learning environments committed to graduate medical education and the well-being of patients, residents, fellows, faculty members, students, and all members of the health care team.*

Int.B.     **Definition of Specialty**

          **[The Review Committee must further specify]**

Int.C.     **Length of Educational Program**

**[The Review Committee must further specify]**

**I.      Oversight**

**I.A.          Sponsoring Institution**

*The Sponsoring Institution is the organization or entity that assumes the ultimate financial and academic responsibility for a program of graduate medical education, consistent with the ACGME Institutional Requirements.*

*When the Sponsoring Institution is not a rotation site for the program, the most commonly utilized site of clinical activity for the program is the primary clinical site.*

---

**Background and Intent:** Participating sites will reflect the health care needs of the community and the educational needs of the residents. A wide variety of organizations may provide a robust educational experience and, thus, Sponsoring Institutions and participating sites may encompass inpatient and outpatient settings including, but not limited to a university, a medical school, a teaching hospital, a nursing home, a school of public health, a health department, a public health agency, an organized health care delivery system, a medical examiner's office, an educational consortium, a teaching health center, a physician group practice, federally qualified health center, or an educational foundation.

---

**I.A.1.          The program must be sponsored by one ACGME-accredited Sponsoring Institution.** (Core)*

**I.B.          Participating Sites**

*A participating site is an organization providing educational experiences or educational assignments/rotations for residents.*

**I.B.1.          The program, with approval of its Sponsoring Institution, must designate a primary clinical site.** (Core)

**[The Review Committee may specify which other specialties/programs must be present at the primary clinical site]**

**I.B.2.          There must be a program letter of agreement (PLA) between the program and each participating site that governs the relationship between the program and the participating site providing a required assignment.** (Core)

**I.B.2.a)          The PLA must:**

**I.B.2.a).(1)          be renewed at least every 10 years; and,** (Core)

**I.B.2.a).(2)          be approved by the designated institutional official (DIO).** (Core)

**I.B.3.**	The program must monitor the clinical learning and working environment at all participating sites. (Core)

**I.B.3.a)**	At each participating site there must be one faculty member, designated by the program director as the site director, who is accountable for resident education at that site, in collaboration with the program director. (Core)

> **Background and Intent:** While all residency programs must be sponsored by a single ACGME-accredited Sponsoring Institution, many programs will utilize other clinical settings to provide required or elective training experiences. At times it is appropriate to utilize community sites that are not owned by or affiliated with the Sponsoring Institution. Some of these sites may be remote for geographic, transportation, or communication issues. When utilizing such sites the program must ensure the quality of the educational experience. The requirements under I.B.3. are intended to ensure that this will be the case.
>
> **Suggested elements to be considered in PLAs will be found in the ACGME Program Director's Guide to the Common Program Requirements. These include:**
> - Identifying the faculty members who will assume educational and supervisory responsibility for residents
> - Specifying the responsibilities for teaching, supervision, and formal evaluation of residents
> - Specifying the duration and content of the educational experience
> - Stating the policies and procedures that will govern resident education during the assignment

**I.B.4.**	The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or more through the ACGME's Accreditation Data System (ADS). (Core)

	**[The Review Committee may further specify]**

**I.C.**	The program, in partnership with its Sponsoring Institution, must engage in practices that focus on mission-driven, ongoing, systematic recruitment and retention of a diverse and inclusive workforce of residents, fellows (if present), faculty members, senior administrative staff members, and other relevant members of its academic community. (Core)

> **Background and Intent:** It is expected that the Sponsoring Institution has, and programs implement, policies and procedures related to recruitment and retention of minorities underrepresented in medicine and medical leadership in accordance with the Sponsoring Institution's mission and aims. The program's annual evaluation must include an assessment of the program's efforts to recruit and retain a diverse workforce, as noted in V.C.1.c).(5).(c).

**I.D.**	**Resources**

I.D.1.          **The program, in partnership with its Sponsoring Institution, must ensure the availability of adequate resources for resident education.** (Core)

          **[The Review Committee must further specify]**

I.D.2.          **The program, in partnership with its Sponsoring Institution, must ensure healthy and safe learning and working environments that promote resident well-being and provide for:** (Core)

I.D.2.a)          **access to food while on duty;** (Core)

I.D.2.b)          **safe, quiet, clean, and private sleep/rest facilities available and accessible for residents with proximity appropriate for safe patient care;** (Core)

> **Background and Intent: Care of patients within a hospital or health system occurs continually through the day and night. Such care requires that residents function at their peak abilities, which requires the work environment to provide them with the ability to meet their basic needs within proximity of their clinical responsibilities. Access to food and rest are examples of these basic needs, which must be met while residents are working. Residents should have access to refrigeration where food may be stored. Food should be available when residents are required to be in the hospital overnight. Rest facilities are necessary, even when overnight call is not required, to accommodate the fatigued resident.**

I.D.2.c)          **clean and private facilities for lactation that have refrigeration capabilities, with proximity appropriate for safe patient care;** (Core)

> **Background and Intent: Sites must provide private and clean locations where residents may lactate and store the milk within a refrigerator. These locations should be in close proximity to clinical responsibilities. It would be helpful to have additional support within these locations that may assist the resident with the continued care of patients, such as a computer and a phone. While space is important, the time required for lactation is also critical for the well-being of the resident and the resident's family, as outlined in VI.C.1.d).(1).**

I.D.2.d)          **security and safety measures appropriate to the participating site; and,** (Core)

I.D.2.e)          **accommodations for residents with disabilities consistent with the Sponsoring Institution's policy.** (Core)

I.D.3.          **Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. This must include access to electronic medical literature databases with full text capabilities.** (Core)

I.D.4.    **The program's educational and clinical resources must be adequate to support the number of residents appointed to the program.** (Core)

      **[The Review Committee may further specify]**

I.E.    **The presence of other learners and other care providers, including, but not limited to, residents from other programs, subspecialty fellows, and advanced practice providers, must enrich the appointed residents' education.** (Core)

I.E.1.    **The program must report circumstances when the presence of other learners has interfered with the residents' education to the DIO and Graduate Medical Education Committee (GMEC).** (Core)

> **Background and Intent: The clinical learning environment has become increasingly complex and often includes care providers, students, and post-graduate residents and fellows from multiple disciplines. The presence of these practitioners and their learners enriches the learning environment. Programs have a responsibility to monitor the learning environment to ensure that residents' education is not compromised by the presence of other providers and learners.**

II.  **Personnel**

II.A.  **Program Director**

II.A.1.    **There must be one faculty member appointed as program director with authority and accountability for the overall program, including compliance with all applicable program requirements.** (Core)

II.A.1.a)    **The Sponsoring Institution's GMEC must approve a change in program director.** (Core)

II.A.1.b)    **Final approval of the program director resides with the Review Committee.** (Core)

> **Background and Intent: While the ACGME recognizes the value of input from numerous individuals in the management of a residency, a single individual must be designated as program director and made responsible for the program. This individual will have dedicated time for the leadership of the residency, and it is this individual's responsibility to communicate with the residents, faculty members, DIO, GMEC, and the ACGME. The program director's nomination is reviewed and approved by the GMEC. Final approval of program directors resides with the Review Committee.**

II.A.1.c)    **The program must demonstrate retention of the program director for a length of time adequate to maintain continuity of leadership and program stability.** (Core)

      **[The Review Committee may further specify]**

Background and Intent: The success of residency programs is generally enhanced by continuity in the program director position. The professional activities required of a program director are unique and complex and take time to master. All programs are encouraged to undertake succession planning to facilitate program stability when there is necessary turnover in the program director position.

II.A.2.          At a minimum, the program director must be provided with the salary support required to devote 20 percent FTE of non-clinical time to the administration of the program. (Core)

                 [The Review Committee may further specify. If the Review Committee specifies support greater than 20 percent, II.A.2. and the accompanying Background and Intent will be modified to reflect the level of support specified by the Review Committee]

                 [The Review Committee may further specify regarding support for associate program director(s)]

Background and Intent: Twenty percent FTE is defined as one day per week.

"Administrative time" is defined as non-clinical time spent meeting the responsibilities of the program director as detailed in requirements II.A.4.-II.A.4.a).(16).

The requirement does not address the source of funding required to provide the specified salary support.

II.A.3.          Qualifications of the program director:

II.A.3.a)        must include specialty expertise and at least three years of documented educational and/or administrative experience, or qualifications acceptable to the Review Committee; (Core)

Background and Intent: Leading a program requires knowledge and skills that are established during residency and subsequently further developed. The time period from completion of residency until assuming the role of program director allows the individual to cultivate leadership abilities while becoming professionally established. The three-year period is intended for the individual's professional maturation.

The broad allowance for educational and/or administrative experience recognizes that strong leaders arise through diverse pathways. These areas of expertise are important when identifying and appointing a program director. The choice of a program director should be informed by the mission of the program and the needs of the community.

In certain circumstances, the program and Sponsoring Institution may propose and the Review Committee may accept a candidate for program director who fulfills these goals but does not meet the three-year minimum.

II.A.3.b)        must include current certification in the specialty for which they are the program director by the American Board of _____ or by the American Osteopathic Board of _____, or specialty

**qualifications that are acceptable to the Review Committee;**
**(Core)**

**[The Review Committee may further specify acceptable specialty qualifications or that only ABMS and AOA certification will be considered acceptable]**

**II.A.3.c)**   **must include current medical licensure and appropriate medical staff appointment; and,** **(Core)**

**II.A.3.d)**   **must include ongoing clinical activity.** **(Core)**

---

**Background and Intent: A program director is a role model for faculty members and residents. The program director must participate in clinical activity consistent with the specialty. This activity will allow the program director to role model the Core Competencies for the faculty members and residents.**

---

**[The Review Committee may further specify additional program director qualifications]**

**II.A.4.**   **Program Director Responsibilities**

**The program director must have responsibility, authority, and accountability for: administration and operations; teaching and scholarly activity; resident recruitment and selection, evaluation, and promotion of residents, and disciplinary action; supervision of residents; and resident education in the context of patient care.** **(Core)**

**II.A.4.a)**   **The program director must:**

**II.A.4.a).(1)**   **be a role model of professionalism;** **(Core)**

---

**Background and Intent: The program director, as the leader of the program, must serve as a role model to residents in addition to fulfilling the technical aspects of the role. As residents are expected to demonstrate compassion, integrity, and respect for others, they must be able to look to the program director as an exemplar. It is of utmost importance, therefore, that the program director model outstanding professionalism, high quality patient care, educational excellence, and a scholarly approach to work. The program director creates an environment where respectful discussion is welcome, with the goal of continued improvement of the educational experience.**

---

**II.A.4.a).(2)**   **design and conduct the program in a fashion consistent with the needs of the community, the mission(s) of the Sponsoring Institution, and the mission(s) of the program;** **(Core)**

---

**Background and Intent: The mission of institutions participating in graduate medical education is to improve the health of the public. Each community has health needs that vary based upon location and demographics. Programs must understand the social**

---

> determinants of health of the populations they serve and incorporate them in the design and implementation of the program curriculum, with the ultimate goal of addressing these needs and health disparities.

II.A.4.a).(3)            administer and maintain a learning environment conducive to educating the residents in each of the ACGME Competency domains; (Core)

> Background and Intent: The program director may establish a leadership team to assist in the accomplishment of program goals. Residency programs can be highly complex. In a complex organization, the leader typically has the ability to delegate authority to others, yet remains accountable. The leadership team may include physician and non-physician personnel with varying levels of education, training, and experience.

II.A.4.a).(4)            develop and oversee a process to evaluate candidates prior to approval as program faculty members for participation in the residency program education and at least annually thereafter, as outlined in V.B.; (Core)

II.A.4.a).(5)            have the authority to approve program faculty members for participation in the residency program education at all sites; (Core)

II.A.4.a).(6)            have the authority to remove program faculty members from participation in the residency program education at all sites; (Core)

II.A.4.a).(7)            have the authority to remove residents from supervising interactions and/or learning environments that do not meet the standards of the program; (Core)

> Background and Intent: The program director has the responsibility to ensure that all who educate residents effectively role model the Core Competencies. Working with a resident is a privilege that is earned through effective teaching and professional role modeling. This privilege may be removed by the program director when the standards of the clinical learning environment are not met.
>
> There may be faculty in a department who are not part of the educational program, and the program director controls who is teaching the residents.

II.A.4.a).(8)            submit accurate and complete information required and requested by the DIO, GMEC, and ACGME; (Core)

II.A.4.a).(9)            provide applicants who are offered an interview with information related to the applicant's eligibility for the relevant specialty board examination(s); (Core)

II.A.4.a).(10)           provide a learning and working environment in which residents have the opportunity to raise concerns and

provide feedback in a confidential manner as appropriate, without fear of intimidation or retaliation; (Core)

**II.A.4.a).(11)** ensure the program's compliance with the Sponsoring Institution's policies and procedures related to grievances and due process; (Core)

**II.A.4.a).(12)** ensure the program's compliance with the Sponsoring Institution's policies and procedures for due process when action is taken to suspend or dismiss, not to promote, or not to renew the appointment of a resident; (Core)

---

**Background and Intent:** A program does not operate independently of its Sponsoring Institution. It is expected that the program director will be aware of the Sponsoring Institution's policies and procedures, and will ensure they are followed by the program's leadership, faculty members, support personnel, and residents.

---

**II.A.4.a).(13)** ensure the program's compliance with the Sponsoring Institution's policies and procedures on employment and non-discrimination; (Core)

**II.A.4.a).(13).(a)** Residents must not be required to sign a non-competition guarantee or restrictive covenant. (Core)

**II.A.4.a).(14)** document verification of program completion for all graduating residents within 30 days; (Core)

**II.A.4.a).(15)** provide verification of an individual resident's completion upon the resident's request, within 30 days; and, (Core)

---

**Background and Intent:** Primary verification of graduate medical education is important to credentialing of physicians for further training and practice. Such verification must be accurate and timely. Sponsoring Institution and program policies for record retention are important to facilitate timely documentation of residents who have previously completed the program. Residents who leave the program prior to completion also require timely documentation of their summative evaluation.

---

**II.A.4.a).(16)** obtain review and approval of the Sponsoring Institution's DIO before submitting information or requests to the ACGME, as required in the Institutional Requirements and outlined in the ACGME Program Director's Guide to the Common Program Requirements. (Core)

**II.B.** **Faculty**

*Faculty members are a foundational element of graduate medical education – faculty members teach residents how to care for patients. Faculty members provide an important bridge allowing residents to grow and become practice-ready, ensuring that patients receive the highest quality of care. They are role models for future generations of physicians by demonstrating compassion, commitment to excellence in teaching and patient care, professionalism, and a dedication to lifelong learning. Faculty members experience the pride and joy of fostering the growth and development of future colleagues. The care they provide is enhanced by the opportunity to teach. By employing a scholarly approach to patient care, faculty members, through the graduate medical education system, improve the health of the individual and the population.*

*Faculty members ensure that patients receive the level of care expected from a specialist in the field. They recognize and respond to the needs of the patients, residents, community, and institution. Faculty members provide appropriate levels of supervision to promote patient safety. Faculty members create an effective learning environment by acting in a professional manner and attending to the well-being of the residents and themselves.*

> **Background and Intent:** "Faculty" refers to the entire teaching force responsible for educating residents. The term "faculty," including "core faculty," does not imply or require an academic appointment or salary support.

| | |
|---|---|
| **II.B.1.** | At each participating site, there must be a sufficient number of faculty members with competence to instruct and supervise all residents at that location. [(Core)] |
| | **[The Review Committee may further specify]** |
| **II.B.2.** | Faculty members must: |
| **II.B.2.a)** | be role models of professionalism; [(Core)] |
| **II.B.2.b)** | demonstrate commitment to the delivery of safe, quality, cost-effective, patient-centered care; [(Core)] |

> **Background and Intent:** Patients have the right to expect quality, cost-effective care with patient safety at its core. The foundation for meeting this expectation is formed during residency and fellowship. Faculty members model these goals and continually strive for improvement in care and cost, embracing a commitment to the patient and the community they serve.

| | |
|---|---|
| **II.B.2.c)** | demonstrate a strong interest in the education of residents; [(Core)] |
| **II.B.2.d)** | devote sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; [(Core)] |

II.B.2.e)              administer and maintain an educational environment
                       conducive to educating residents; (Core)

II.B.2.f)              regularly participate in organized clinical discussions,
                       rounds, journal clubs, and conferences; and, (Core)

II.B.2.g)              pursue faculty development designed to enhance their skills
                       at least annually: (Core)

> **Background and Intent:** Faculty development is intended to describe structured
> programming developed for the purpose of enhancing transference of knowledge,
> skill, and behavior from the educator to the learner. Faculty development may occur
> in a variety of configurations (lecture, workshop, etc.) using internal and/or external
> resources. Programming is typically needs-based (individual or group) and may be
> specific to the institution or the program. Faculty development programming is to be
> reported for the residency program faculty in the aggregate.

II.B.2.g).(1)                   as educators; (Core)

II.B.2.g).(2)                   in quality improvement and patient safety; (Core)

II.B.2.g).(3)                   in fostering their own and their residents' well-being;
                                and, (Core)

II.B.2.g).(4)                   in patient care based on their practice-based learning
                                and improvement efforts. (Core)

> **Background and Intent:** Practice-based learning serves as the foundation for the
> practice of medicine. Through a systematic analysis of one's practice and review of the
> literature, one is able to make adjustments that improve patient outcomes and care.
> Thoughtful consideration to practice-based analysis improves quality of care, as well
> as patient safety. This allows faculty members to serve as role models for residents in
> practice-based learning.

                       [The Review Committee may further specify additional faculty
                       responsibilities]

II.B.3.                **Faculty Qualifications**

II.B.3.a)              Faculty members must have appropriate qualifications in
                       their field and hold appropriate institutional appointments.
                       (Core)

                       [The Review Committee may further specify]

II.B.3.b)              Physician faculty members must:

II.B.3.b).(1)                   have current certification in the specialty by the
                                American Board of _____ or the American Osteopathic
                                Board of _____, or possess qualifications judged
                                acceptable to the Review Committee. (Core)

[The Review Committee may further specify additional qualifications]

II.B.3.c)     Any non-physician faculty members who participate in residency program education must be approved by the program director. (Core)

[The Review Committee may further specify]

Background and Intent: The provision of optimal and safe patient care requires a team approach. The education of residents by non-physician educators enables the resident to better manage patient care and provides valuable advancement of the residents' knowledge. Furthermore, other individuals contribute to the education of the resident in the basic science of the specialty or in research methodology. If the program director determines that the contribution of a non-physician individual is significant to the education of the residents, the program director may designate the individual as a program faculty member or a program core faculty member.

II.B.4.     Core Faculty

Core faculty members must have a significant role in the education and supervision of residents and must devote a significant portion of their entire effort to resident education and/or administration, and must, as a component of their activities, teach, evaluate, and provide formative feedback to residents. (Core)

Background and Intent: Core faculty members are critical to the success of resident education. They support the program leadership in developing, implementing, and assessing curriculum and in assessing residents' progress toward achievement of competence in the specialty. Core faculty members should be selected for their broad knowledge of and involvement in the program, permitting them to effectively evaluate the program, including completion of the annual ACGME Faculty Survey.

II.B.4.a)     Core faculty members must be designated by the program director. (Core)

II.B.4.b)     Core faculty members must complete the annual ACGME Faculty Survey. (Core)

[The Review Committee must specify the minimum number of core faculty and/or the core faculty-resident ratio]

[The Review Committee may further specify requirements regarding support for core faculty members]

[The Review Committee may specify requirements specific to associate program director(s)]

II.C.     Program Coordinator

**II.C.1.**      There must be a program coordinator. (Core)

**II.C.2.**      At a minimum, the program coordinator must be supported at 50 percent FTE for the administration of the program. (Core)

[The Review Committee may further specify. If the Review Committee specifies support greater than 50 percent, II.C.2. and the accompanying Background and Intent will be modified to reflect the level of support specified by the Review Committee]

---

Background and Intent: Fifty percent FTE is defined as two-and-a-half (2.5) days per week.

The requirement does not address the source of funding required to provide the specified salary support.

Each program requires a lead administrative person, frequently referred to as a program coordinator, administrator, or as titled by the institution. This person will frequently manage the day-to-day operations of the program and serve as an important liaison with learners, faculty and other staff members, and the ACGME. Individuals serving in this role are recognized as program coordinators by the ACGME.

The program coordinator is a member of the leadership team and is critical to the success of the program. As such, the program coordinator must possess skills in leadership and personnel management. Program coordinators are expected to develop unique knowledge of the ACGME and Program Requirements, policies, and procedures. Program coordinators assist the program director in accreditation efforts, educational programming, and support of residents.

Programs, in partnership with their Sponsoring Institutions, should encourage the professional development of their program coordinators and avail them of opportunities for both professional and personal growth. Programs with fewer residents may not require a full-time coordinator; one coordinator may support more than one program.

---

**II.D.**      Other Program Personnel

The program, in partnership with its Sponsoring Institution, must jointly ensure the availability of necessary personnel for the effective administration of the program. (Core)

[The Review Committee may further specify]

---

Background and Intent: Multiple personnel may be required to effectively administer a program. These may include staff members with clerical skills, project managers, education experts, and staff members to maintain electronic communication for the program. These personnel may support more than one program in more than one discipline.

---

**III.**      Resident Appointments

**III.A.**          **Eligibility Requirements**

**III.A.1.**          **An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program:** (Core)

**III.A.1.a)**          **graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME) or graduation from a college of osteopathic medicine in the United States, accredited by the American Osteopathic Association Commission on Osteopathic College Accreditation (AOACOCA); or,** (Core)

**III.A.1.b)**          **graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications:** (Core)

**III.A.1.b).(1)**          **holding a currently valid certificate from the Educational Commission for Foreign Medical Graduates (ECFMG) prior to appointment; or,** (Core)

**III.A.1.b).(2)**          **holding a full and unrestricted license to practice medicine in the United States licensing jurisdiction in which the ACGME-accredited program is located.** (Core)

**III.A.2.**          **All prerequisite post-graduate clinical education required for initial entry or transfer into ACGME-accredited residency programs must be completed in ACGME-accredited residency programs, AOA-approved residency programs, Royal College of Physicians and Surgeons of Canada (RCPSC)-accredited or College of Family Physicians of Canada (CFPC)-accredited residency programs located in Canada, or in residency programs with ACGME International (ACGME-I) Advanced Specialty Accreditation.** (Core)

**III.A.2.a)**          **Residency programs must receive verification of each resident's level of competency in the required clinical field using ACGME, CanMEDS, or ACGME-I Milestones evaluations from the prior training program upon matriculation.** (Core)

          **[The Review Committee may further specify prerequisite postgraduate clinical education]**

> **Background and Intent: Programs with ACGME-I Foundational Accreditation or from institutions with ACGME-I accreditation do not qualify unless the program has also achieved ACGME-I Advanced Specialty Accreditation. To ensure entrants into ACGME-accredited programs from ACGME-I programs have attained the prerequisite milestones for this training, they must be from programs that have ACGME-I Advanced Specialty Accreditation.**

**III.A.3.**          **A physician who has completed a residency program that was not accredited by ACGME, AOA, RCPSC, CFPC, or ACGME-I (with Advanced Specialty Accreditation) may enter an ACGME-accredited**

residency program in the same specialty at the PGY-1 level and, at the discretion of the program director of the ACGME-accredited program and with approval by the GMEC, may be advanced to the PGY-2 level based on ACGME Milestones evaluations at the ACGME-accredited program. This provision applies only to entry into residency in those specialties for which an initial clinical year is not required for entry. (Core)

III.A.4.          **Resident Eligibility Exception**

The Review Committee for _____ will allow the following exception to the resident eligibility requirements: (Core)

[Note: A Review Committee may permit the eligibility exception if the specialty requires completion of a prerequisite residency program prior to admission. If the specialty-specific Program Requirements define multiple program formats, the Review Committee may permit the exception only for the format(s) that require completion of a prerequisite residency program prior to admission. If this language is not applicable, this section will not appear in the specialty-specific requirements.]

III.A.4.a)          An ACGME-accredited residency program may accept an exceptionally qualified international graduate applicant who does not satisfy the eligibility requirements listed in III.A.1.-III.A.3., but who does meet all of the following additional qualifications and conditions: (Core)

III.A.4.a).(1)          evaluation by the program director and residency selection committee of the applicant's suitability to enter the program, based on prior training and review of the summative evaluations of this training; and, (Core)

III.A.4.a).(2)          review and approval of the applicant's exceptional qualifications by the GMEC; and, (Core)

III.A.4.a).(3)          verification of Educational Commission for Foreign Medical Graduates (ECFMG) certification. (Core)

III.A.4.b)          Applicants accepted through this exception must have an evaluation of their performance by the Clinical Competency Committee within 12 weeks of matriculation. (Core)

III.B.          The program director must not appoint more residents than approved by the Review Committee. (Core)

III.B.1.          All complement increases must be approved by the Review Committee. (Core)

[The Review Committee may further specify minimum complement numbers]

III.C.  **Resident Transfers**

**The program must obtain verification of previous educational experiences and a summative competency-based performance evaluation prior to acceptance of a transferring resident, and Milestones evaluations upon matriculation.** [(Core)]

**[The Review Committee may further specify]**

IV.  **Educational Program**

*The ACGME accreditation system is designed to encourage excellence and innovation in graduate medical education regardless of the organizational affiliation, size, or location of the program.*

*The educational program must support the development of knowledgeable, skillful physicians who provide compassionate care.*

*In addition, the program is expected to define its specific program aims consistent with the overall mission of its Sponsoring Institution, the needs of the community it serves and that its graduates will serve, and the distinctive capabilities of physicians it intends to graduate. While programs must demonstrate substantial compliance with the Common and specialty-specific Program Requirements, it is recognized that within this framework, programs may place different emphasis on research, leadership, public health, etc. It is expected that the program aims will reflect the nuanced program-specific goals for it and its graduates; for example, it is expected that a program aiming to prepare physician-scientists will have a different curriculum from one focusing on community health.*

IV.A.  **The curriculum must contain the following educational components:** [(Core)]

IV.A.1.  **a set of program aims consistent with the Sponsoring Institution's mission, the needs of the community it serves, and the desired distinctive capabilities of its graduates;** [(Core)]

IV.A.1.a)  **The program's aims must be made available to program applicants, residents, and faculty members.** [(Core)]

IV.A.2.  **competency-based goals and objectives for each educational experience designed to promote progress on a trajectory to autonomous practice. These must be distributed, reviewed, and available to residents and faculty members;** [(Core)]

> **Background and Intent:** The trajectory to autonomous practice is documented by Milestones evaluation. The Milestones detail the progress of a resident in attaining skill in each competency domain. They are developed by each specialty group and allow evaluation based on observable behaviors. Milestones are considered formative and should be used to identify learning needs. This may lead to focused or general curricular revision in any given program or to individualized learning plans for any specific resident.

**IV.A.3.**              delineation of resident responsibilities for patient care, progressive responsibility for patient management, and graded supervision; (Core)

> Background and Intent: These responsibilities may generally be described by PGY level and specifically by Milestones progress as determined by the Clinical Competency Committee. This approach encourages the transition to competency-based education. An advanced learner may be granted more responsibility independent of PGY level and a learner needing more time to accomplish a certain task may do so in a focused rather than global manner.

**IV.A.4.**              a broad range of structured didactic activities; (Core)

**IV.A.4.a)**            Residents must be provided with protected time to participate in core didactic activities. (Core)

> Background and Intent: It is intended that residents will participate in structured didactic activities. It is recognized that there may be circumstances in which this is not possible. Programs should define core didactic activities for which time is protected and the circumstances in which residents may be excused from these didactic activities. Didactic activities may include, but are not limited to, lectures, conferences, courses, labs, asynchronous learning, simulations, drills, case discussions, grand rounds, didactic teaching, and education in critical appraisal of medical evidence.

**IV.A.5.**              advancement of residents' knowledge of ethical principles foundational to medical professionalism; and, (Core)

**IV.A.6.**              advancement in the residents' knowledge of the basic principles of scientific inquiry, including how research is designed, conducted, evaluated, explained to patients, and applied to patient care. (Core)

**IV.B.**         ACGME Competencies

> Background and Intent: The Competencies provide a conceptual framework describing the required domains for a trusted physician to enter autonomous practice. These Competencies are core to the practice of all physicians, although the specifics are further defined by each specialty. The developmental trajectories in each of the Competencies are articulated through the Milestones for each specialty.

**IV.B.1.**              The program must integrate the following ACGME Competencies into the curriculum: (Core)

**IV.B.1.a)**            Professionalism

                        Residents must demonstrate a commitment to professionalism and an adherence to ethical principles. (Core)

**IV.B.1.a).(1)**            Residents must demonstrate competence in:

IV.B.1.a).(1).(a)                    compassion, integrity, and respect for others; (Core)

IV.B.1.a).(1).(b)                    responsiveness to patient needs that supersedes self-interest; (Core)

Background and Intent: This includes the recognition that under certain circumstances, the interests of the patient may be best served by transitioning care to another provider. Examples include fatigue, conflict or duality of interest, not connecting well with a patient, or when another physician would be better for the situation based on skill set or knowledge base.

IV.B.1.a).(1).(c)                    respect for patient privacy and autonomy; (Core)

IV.B.1.a).(1).(d)                    accountability to patients, society, and the profession; (Core)

IV.B.1.a).(1).(e)                    respect and responsiveness to diverse patient populations, including but not limited to diversity in gender, age, culture, race, religion, disabilities, national origin, socioeconomic status, and sexual orientation; (Core)

IV.B.1.a).(1).(f)                    ability to recognize and develop a plan for one's own personal and professional well-being; and, (Core)

IV.B.1.a).(1).(g)                    appropriately disclosing and addressing conflict or duality of interest. (Core)

IV.B.1.b)                    Patient Care and Procedural Skills

Background and Intent: Quality patient care is safe, effective, timely, efficient, patient-centered, equitable, and designed to improve population health, while reducing per capita costs. (See the Institute of Medicine [IOM]'s *Crossing the Quality Chasm: A New Health System for the 21st Century*, 2001 and Berwick D, Nolan T, Whittington J. *The Triple Aim: care, cost, and quality. Health Affairs.* 2008; 27(3):759-769.). In addition, there should be a focus on improving the clinician's well-being as a means to improve patient care and reduce burnout among residents, fellows, and practicing physicians.

These organizing principles inform the Common Program Requirements across all Competency domains. Specific content is determined by the Review Committees with input from the appropriate professional societies, certifying boards, and the community.

IV.B.1.b).(1)                    Residents must be able to provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. (Core)

[The Review Committee must further specify]

**IV.B.1.b).(2)**    **Residents must be able to perform all medical, diagnostic, and surgical procedures considered essential for the area of practice.** (Core)

[The Review Committee may further specify]

**IV.B.1.c)**    **Medical Knowledge**

**Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological and social-behavioral sciences, as well as the application of this knowledge to patient care.** (Core)

[The Review Committee must further specify]

**IV.B.1.d)**    **Practice-based Learning and Improvement**

**Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning.** (Core)

---

**Background and Intent:** Practice-based learning and improvement is one of the defining characteristics of being a physician. It is the ability to investigate and evaluate the care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning.

The intention of this Competency is to help a physician develop the habits of mind required to continuously pursue quality improvement, well past the completion of residency.

---

**IV.B.1.d).(1)**    **Residents must demonstrate competence in:**

**IV.B.1.d).(1).(a)**    **identifying strengths, deficiencies, and limits in one's knowledge and expertise;** (Core)

**IV.B.1.d).(1).(b)**    **setting learning and improvement goals;** (Core)

**IV.B.1.d).(1).(c)**    **identifying and performing appropriate learning activities;** (Core)

**IV.B.1.d).(1).(d)**    **systematically analyzing practice using quality improvement methods, and implementing changes with the goal of practice improvement;** (Core)

**IV.B.1.d).(1).(e)**    **incorporating feedback and formative evaluation into daily practice;** (Core)

**IV.B.1.d).(1).(f)**      **locating, appraising, and assimilating evidence from scientific studies related to their patients' health problems; and, (Core)**

**IV.B.1.d).(1).(g)**      **using information technology to optimize learning. (Core)**

      **[The Review Committee may further specify by adding to the list of sub-competencies]**

**IV.B.1.e)**      **Interpersonal and Communication Skills**

      **Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals. (Core)**

**IV.B.1.e).(1)**      **Residents must demonstrate competence in:**

**IV.B.1.e).(1).(a)**      **communicating effectively with patients, families, and the public, as appropriate, across a broad range of socioeconomic and cultural backgrounds; (Core)**

**IV.B.1.e).(1).(b)**      **communicating effectively with physicians, other health professionals, and health-related agencies; (Core)**

**IV.B.1.e).(1).(c)**      **working effectively as a member or leader of a health care team or other professional group; (Core)**

**IV.B.1.e).(1).(d)**      **educating patients, families, students, residents, and other health professionals; (Core)**

**IV.B.1.e).(1).(e)**      **acting in a consultative role to other physicians and health professionals; and, (Core)**

**IV.B.1.e).(1).(f)**      **maintaining comprehensive, timely, and legible medical records, if applicable. (Core)**

**IV.B.1.e).(2)**      **Residents must learn to communicate with patients and families to partner with them to assess their care goals, including, when appropriate, end-of-life goals. (Core)**

      **[The Review Committee may further specify by adding to the list of sub-competencies]**

Background and Intent: When there are no more medications or interventions that can achieve a patient's goals or provide meaningful improvements in quality or length of life, a discussion about the patient's goals, values, and choices surrounding the end of life is one of the most important conversations that can occur. Residents must learn to participate effectively and compassionately in these meaningful human interactions, for the sake of their patients and themselves.

Programs may teach this skill through direct clinical experience, simulation, or other means of active learning.

| IV.B.1.f) | **Systems-based Practice** |
|---|---|
| | Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, including the social determinants of health, as well as the ability to call effectively on other resources to provide optimal health care. (Core) |
| IV.B.1.f).(1) | Residents must demonstrate competence in: |
| IV.B.1.f).(1).(a) | working effectively in various health care delivery settings and systems relevant to their clinical specialty; (Core) |

Background and Intent: Medical practice occurs in the context of an increasingly complex clinical care environment where optimal patient care requires attention to compliance with external and internal administrative and regulatory requirements.

| IV.B.1.f).(1).(b) | coordinating patient care across the health care continuum and beyond as relevant to their clinical specialty; (Core) |
|---|---|

Background and Intent: Every patient deserves to be treated as a whole person. Therefore it is recognized that any one component of the health care system does not meet the totality of the patient's needs. An appropriate transition plan requires coordination and forethought by an interdisciplinary team. The patient benefits from proper care and the system benefits from proper use of resources.

| IV.B.1.f).(1).(c) | advocating for quality patient care and optimal patient care systems; (Core) |
|---|---|
| IV.B.1.f).(1).(d) | working in interprofessional teams to enhance patient safety and improve patient care quality; (Core) |
| IV.B.1.f).(1).(e) | participating in identifying system errors and implementing potential systems solutions; (Core) |
| IV.B.1.f).(1).(f) | incorporating considerations of value, cost awareness, delivery and payment, and risk- |

|  | benefit analysis in patient and/or population-based care as appropriate; and, (Core) |
|---|---|
| IV.B.1.f).(1).(g) | understanding health care finances and its impact on individual patients' health decisions. (Core) |
| IV.B.1.f).(2) | Residents must learn to advocate for patients within the health care system to achieve the patient's and family's care goals, including, when appropriate, end-of-life goals. (Core) |

**[The Review Committee may further specify by adding to the list of sub-competencies]**

IV.C. **Curriculum Organization and Resident Experiences**

IV.C.1. The curriculum must be structured to optimize resident educational experiences, the length of these experiences, and supervisory continuity. (Core)

**[The Review Committee must further specify]**

> Background and Intent: In some specialties, frequent rotational transitions, inadequate continuity of faculty member supervision, and dispersed patient locations within the hospital have adversely affected optimal resident education and effective team-based care. The need for patient care continuity varies from specialty to specialty and by clinical situation, and may be addressed by the individual Review Committee.

IV.C.2. The program must provide instruction and experience in pain management if applicable for the specialty, including recognition of the signs of addiction. (Core)

**[The Review Committee may further specify]**

**[The Review Committee may specify required didactic and clinical experiences]**

IV.D. **Scholarship**

*Medicine is both an art and a science. The physician is a humanistic scientist who cares for patients. This requires the ability to think critically, evaluate the literature, appropriately assimilate new knowledge, and practice lifelong learning. The program and faculty must create an environment that fosters the acquisition of such skills through resident participation in scholarly activities. Scholarly activities may include discovery, integration, application, and teaching.*

*The ACGME recognizes the diversity of residencies and anticipates that programs prepare physicians for a variety of roles, including clinicians,*

*scientists, and educators. It is expected that the program's scholarship will reflect its mission(s) and aims, and the needs of the community it serves. For example, some programs may concentrate their scholarly activity on quality improvement, population health, and/or teaching, while other programs might choose to utilize more classic forms of biomedical research as the focus for scholarship.*

**IV.D.1.**    **Program Responsibilities**

**IV.D.1.a)**    **The program must demonstrate evidence of scholarly activities consistent with its mission(s) and aims.** (Core)

**IV.D.1.b)**    **The program, in partnership with its Sponsoring Institution, must allocate adequate resources to facilitate resident and faculty involvement in scholarly activities.** (Core)

    **[The Review Committee may further specify]**

**IV.D.1.c)**    **The program must advance residents' knowledge and practice of the scholarly approach to evidence-based patient care.** (Core)

---

**Background and Intent:** The scholarly approach can be defined as a synthesis of teaching, learning, and research with the aim of encouraging curiosity and critical thinking based on an understanding of physiology, pathophysiology, differential diagnosis, treatments, treatment alternatives, efficiency of care, and patient safety. While some faculty members are responsible for fulfilling the traditional elements of scholarship through research, integration, and teaching, all faculty members are responsible for advancing residents' scholarly approach to patient care.

**Elements of a scholarly approach to patient care include:**
- **Asking meaningful questions to stimulate residents to utilize learning resources to create a differential diagnosis, a diagnostic algorithm, and treatment plan**
- **Challenging the evidence that the residents use to reach their medical decisions so that they understand the benefits and limits of the medical literature**
- **When appropriate, dissemination of scholarly learning in a peer-reviewed manner (publication or presentation)**
- **Improving resident learning by encouraging them to teach using a scholarly approach**

**The scholarly approach to patient care begins with curiosity, is grounded in the principles of evidence-based medicine, expands the knowledge base through dissemination, and develops the habits of lifelong learning by encouraging residents to be scholarly teachers.**

---

**IV.D.2.**    **Faculty Scholarly Activity**

**IV.D.2.a)**    **Among their scholarly activity, programs must demonstrate accomplishments in at least three of the following domains:** (Core)

- **Research in basic science, education, translational science, patient care, or population health**
- **Peer-reviewed grants**
- **Quality improvement and/or patient safety initiatives**
- **Systematic reviews, meta-analyses, review articles, chapters in medical textbooks, or case reports**
- **Creation of curricula, evaluation tools, didactic educational activities, or electronic educational materials**
- **Contribution to professional committees, educational organizations, or editorial boards**
- **Innovations in education**

**IV.D.2.b)**     **The program must demonstrate dissemination of scholarly activity within and external to the program by the following methods:**

**[Review Committee will choose to require either IV.D.2.b).(1) or both IV.D.2.b).(1) and IV.D.2.b).(2)]**

> **Background and Intent: For the purposes of education, metrics of scholarly activity represent one of the surrogates for the program's effectiveness in the creation of an environment of inquiry that advances the residents' scholarly approach to patient care. The Review Committee will evaluate the dissemination of scholarship for the program as a whole, not for individual faculty members, for a five-year interval, for both core and non-core faculty members, with the goal of assessing the effectiveness of the creation of such an environment. The ACGME recognizes that there may be differences in scholarship requirements between different specialties and between residencies and fellowships in the same specialty.**

**IV.D.2.b).(1)**     **faculty participation in grand rounds, posters, workshops, quality improvement presentations, podium presentations, grant leadership, non-peer-reviewed print/electronic resources, articles or publications, book chapters, textbooks, webinars, service on professional committees, or serving as a journal reviewer, journal editorial board member, or editor;** [Outcome]‡

**IV.D.2.b).(2)**     **peer-reviewed publication.** [Outcome]

**IV.D.3.**     **Resident Scholarly Activity**

**IV.D.3.a)**     **Residents must participate in scholarship.** [Core]

**[The Review Committee may further specify]**

**V.     Evaluation**

**V.A.**          **Resident Evaluation**

**V.A.1.**          **Feedback and Evaluation**

---

Background and Intent: Feedback is ongoing information provided regarding aspects of one's performance, knowledge, or understanding. The faculty empower residents to provide much of that feedback themselves in a spirit of continuous learning and self-reflection. Feedback from faculty members in the context of routine clinical care should be frequent, and need not always be formally documented.

Formative and summative evaluation have distinct definitions. Formative evaluation is *monitoring resident learning* and providing ongoing feedback that can be used by residents to improve their learning in the context of provision of patient care or other educational opportunities. More specifically, formative evaluations help:
- residents identify their strengths and weaknesses and target areas that need work
- program directors and faculty members recognize where residents are struggling and address problems immediately

Summative evaluation is *evaluating a resident's learning* by comparing the residents against the goals and objectives of the rotation and program, respectively. Summative evaluation is utilized to make decisions about promotion to the next level of training, or program completion.

End-of-rotation and end-of-year evaluations have both summative and formative components. Information from a summative evaluation can be used formatively when residents or faculty members use it to guide their efforts and activities in subsequent rotations and to successfully complete the residency program.

Feedback, formative evaluation, and summative evaluation compare intentions with accomplishments, enabling the transformation of a neophyte physician to one with growing expertise.

---

**V.A.1.a)**          Faculty members must directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment. (Core)

---

Background and Intent: Faculty members should provide feedback frequently throughout the course of each rotation. Residents require feedback from faculty members to reinforce well-performed duties and tasks, as well as to correct deficiencies. This feedback will allow for the development of the learner as they strive to achieve the Milestones. More frequent feedback is strongly encouraged for residents who have deficiencies that may result in a poor final rotation evaluation.

---

**V.A.1.b)**          Evaluation must be documented at the completion of the assignment. (Core)

**V.A.1.b).(1)**          For block rotations of greater than three months in duration, evaluation must be documented at least every three months. (Core)

**V.A.1.b).(2)**                 **Longitudinal experiences, such as continuity clinic in the context of other clinical responsibilities, must be evaluated at least every three months and at completion.** (Core)

**V.A.1.c)**                     **The program must provide an objective performance evaluation based on the Competencies and the specialty-specific Milestones, and must:** (Core)

**V.A.1.c).(1)**                 **use multiple evaluators (e.g., faculty members, peers, patients, self, and other professional staff members); and,** (Core)

**V.A.1.c).(2)**                 **provide that information to the Clinical Competency Committee for its synthesis of progressive resident performance and improvement toward unsupervised practice.** (Core)

**V.A.1.d)**                     **The program director or their designee, with input from the Clinical Competency Committee, must:**

**V.A.1.d).(1)**                 **meet with and review with each resident their documented semi-annual evaluation of performance, including progress along the specialty-specific Milestones;** (Core)

**V.A.1.d).(2)**                 **assist residents in developing individualized learning plans to capitalize on their strengths and identify areas for growth; and,** (Core)

**V.A.1.d).(3)**                 **develop plans for residents failing to progress, following institutional policies and procedures.** (Core)

---

**Background and Intent:** Learning is an active process that requires effort from the teacher and the learner. Faculty members evaluate a resident's performance at least at the end of each rotation. The program director or their designee will review those evaluations, including their progress on the Milestones, at a minimum of every six months. Residents should be encouraged to reflect upon the evaluation, using the information to reinforce well-performed tasks or knowledge or to modify deficiencies in knowledge or practice. Working together with the faculty members, residents should develop an individualized learning plan.

Residents who are experiencing difficulties with achieving progress along the Milestones may require intervention to address specific deficiencies. Such intervention, documented in an individual remediation plan developed by the program director or a faculty mentor and the resident, will take a variety of forms based on the specific learning needs of the resident. However, the ACGME recognizes that there are situations which require more significant intervention that may alter the time course of resident progression. To ensure due process, it is essential that the program director follow institutional policies and procedures.

---

**V.A.1.e)**     At least annually, there must be a summative evaluation of each resident that includes their readiness to progress to the next year of the program, if applicable. (Core)

**V.A.1.f)**     The evaluations of a resident's performance must be accessible for review by the resident. (Core)

[The Review Committee may further specify under any requirement in V.A.1.-V.A.1.f)]

**V.A.2.**     **Final Evaluation**

**V.A.2.a)**     The program director must provide a final evaluation for each resident upon completion of the program. (Core)

**V.A.2.a).(1)**     The specialty-specific Milestones, and when applicable the specialty-specific Case Logs, must be used as tools to ensure residents are able to engage in autonomous practice upon completion of the program. (Core)

**V.A.2.a).(2)**     The final evaluation must:

**V.A.2.a).(2).(a)**     become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy; (Core)

**V.A.2.a).(2).(b)**     verify that the resident has demonstrated the knowledge, skills, and behaviors necessary to enter autonomous practice; (Core)

**V.A.2.a).(2).(c)**     consider recommendations from the Clinical Competency Committee; and, (Core)

**V.A.2.a).(2).(d)**     be shared with the resident upon completion of the program. (Core)

**V.A.3.**     A Clinical Competency Committee must be appointed by the program director. (Core)

**V.A.3.a)**     At a minimum, the Clinical Competency Committee must include three members of the program faculty, at least one of whom is a core faculty member. (Core)

**V.A.3.a).(1)**     Additional members must be faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents. (Core)

> **Background and Intent:** The requirements regarding the Clinical Competency Committee do not preclude or limit a program director's participation on the Clinical Competency Committee. The intent is to leave flexibility for each program to decide the best structure for its own circumstances, but a program should consider: its program director's other roles as resident advocate, advisor, and confidante; the impact of the program director's presence on the other Clinical Competency Committee members' discussions and decisions; the size of the program faculty; and other program-relevant factors. The program director has final responsibility for resident evaluation and promotion decisions.
>
> Program faculty may include more than the physician faculty members, such as other physicians and non-physicians who teach and evaluate the program's residents. There may be additional members of the Clinical Competency Committee. Chief residents who have completed core residency programs in their specialty may be members of the Clinical Competency Committee.

**V.A.3.b)**     The Clinical Competency Committee must:

**V.A.3.b).(1)**     review all resident evaluations at least semi-annually; (Core)

**V.A.3.b).(2)**     determine each resident's progress on achievement of the specialty-specific Milestones; and, (Core)

**V.A.3.b).(3)**     meet prior to the residents' semi-annual evaluations and advise the program director regarding each resident's progress. (Core)

**V.B.**     **Faculty Evaluation**

**V.B.1.**     The program must have a process to evaluate each faculty member's performance as it relates to the educational program at least annually. (Core)

> **Background and Intent:** The program director is responsible for the education program and for whom delivers it. While the term "faculty" may be applied to physicians within a given institution for other reasons, it is applied to residency program faculty members only through approval by a program director. The development of the faculty improves the education, clinical, and research aspects of a program. Faculty members have a strong commitment to the resident and desire to provide optimal education and work opportunities. Faculty members must be provided feedback on their contribution to the mission of the program. All faculty members who interact with residents desire feedback on their education, clinical care, and research. If a faculty member does not interact with residents, feedback is not required. With regard to the diverse operating environments and configurations, the residency program director may need to work with others to determine the effectiveness of the program's faculty performance with regard to their role in the educational program. All teaching faculty members should have their educational efforts evaluated by the residents in a confidential and anonymous manner. Other aspects for the feedback may include research or clinical productivity, review of patient outcomes, or peer review of scholarly activity. The process should reflect the local environment and identify the necessary information.

> The feedback from the various sources should be summarized and provided to the faculty on an annual basis by a member of the leadership team of the program.

**V.B.1.a)**  This evaluation must include a review of the faculty member's clinical teaching abilities, engagement with the educational program, participation in faculty development related to their skills as an educator, clinical performance, professionalism, and scholarly activities. [(Core)]

**V.B.1.b)**  This evaluation must include written, anonymous, and confidential evaluations by the residents. [(Core)]

**V.B.2.**  Faculty members must receive feedback on their evaluations at least annually. [(Core)]

**V.B.3.**  Results of the faculty educational evaluations should be incorporated into program-wide faculty development plans. [(Core)]

> Background and Intent: The quality of the faculty's teaching and clinical care is a determinant of the quality of the program and the quality of the residents' future clinical care. Therefore, the program has the responsibility to evaluate and improve the program faculty members' teaching, scholarship, professionalism, and quality care. This section mandates annual review of the program's faculty members for this purpose, and can be used as input into the Annual Program Evaluation.

**V.C.**  Program Evaluation and Improvement

**V.C.1.**  The program director must appoint the Program Evaluation Committee to conduct and document the Annual Program Evaluation as part of the program's continuous improvement process. [(Core)]

**V.C.1.a)**  The Program Evaluation Committee must be composed of at least two program faculty members, at least one of whom is a core faculty member, and at least one resident. [(Core)]

**V.C.1.b)**  Program Evaluation Committee responsibilities must include:

**V.C.1.b).(1)**  acting as an advisor to the program director, through program oversight; [(Core)]

**V.C.1.b).(2)**  review of the program's self-determined goals and progress toward meeting them; [(Core)]

**V.C.1.b).(3)**  guiding ongoing program improvement, including development of new goals, based upon outcomes; and, [(Core)]

**V.C.1.b).(4)**  review of the current operating environment to identify strengths, challenges, opportunities, and threats as related to the program's mission and aims. [(Core)]

> **Background and Intent:** In order to achieve its mission and train quality physicians, a program must evaluate its performance and plan for improvement in the Annual Program Evaluation. Performance of residents and faculty members is a reflection of program quality, and can use metrics that reflect the goals that a program has set for itself. The Program Evaluation Committee utilizes outcome parameters and other data to assess the program's progress toward achievement of its goals and aims.

| | |
|---|---|
| **V.C.1.c)** | **The Program Evaluation Committee should consider the following elements in its assessment of the program:** |
| **V.C.1.c).(1)** | **curriculum;** (Core) |
| **V.C.1.c).(2)** | **outcomes from prior Annual Program Evaluation(s);** (Core) |
| **V.C.1.c).(3)** | **ACGME letters of notification, including citations, Areas for Improvement, and comments;** (Core) |
| **V.C.1.c).(4)** | **quality and safety of patient care;** (Core) |
| **V.C.1.c).(5)** | **aggregate resident and faculty:** |
| **V.C.1.c).(5).(a)** | **well-being;** (Core) |
| **V.C.1.c).(5).(b)** | **recruitment and retention;** (Core) |
| **V.C.1.c).(5).(c)** | **workforce diversity;** (Core) |
| **V.C.1.c).(5).(d)** | **engagement in quality improvement and patient safety;** (Core) |
| **V.C.1.c).(5).(e)** | **scholarly activity;** (Core) |
| **V.C.1.c).(5).(f)** | **ACGME Resident and Faculty Surveys; and,** (Core) |
| **V.C.1.c).(5).(g)** | **written evaluations of the program.** (Core) |
| **V.C.1.c).(6)** | **aggregate resident:** |
| **V.C.1.c).(6).(a)** | **achievement of the Milestones;** (Core) |
| **V.C.1.c).(6).(b)** | **in-training examinations (where applicable);** (Core) |
| **V.C.1.c).(6).(c)** | **board pass and certification rates; and,** (Core) |
| **V.C.1.c).(6).(d)** | **graduate performance.** (Core) |
| **V.C.1.c).(7)** | **aggregate faculty:** |

**V.C.1.c).(7).(a)**        evaluation; and, <sup>(Core)</sup>

**V.C.1.c).(7).(b)**        professional development. <sup>(Core)</sup>

**V.C.1.d)**    **The Program Evaluation Committee must evaluate the program's mission and aims, strengths, areas for improvement, and threats.** <sup>(Core)</sup>

**V.C.1.e)**    **The annual review, including the action plan, must:**

**V.C.1.e).(1)**      **be distributed to and discussed with the members of the teaching faculty and the residents; and,** <sup>(Core)</sup>

**V.C.1.e).(2)**      **be submitted to the DIO.** <sup>(Core)</sup>

**V.C.2.**    **The program must complete a Self-Study prior to its 10-Year Accreditation Site Visit.** <sup>(Core)</sup>

**V.C.2.a)**      **A summary of the Self-Study must be submitted to the DIO.** <sup>(Core)</sup>

---

**Background and Intent:** Outcomes of the documented Annual Program Evaluation can be integrated into the 10-year Self-Study process. The Self-Study is an objective, comprehensive evaluation of the residency program, with the aim of improving it. Underlying the Self-Study is this longitudinal evaluation of the program and its learning environment, facilitated through sequential Annual Program Evaluations that focus on the required components, with an emphasis on program strengths and self-identified areas for improvement. Details regarding the timing and expectations for the Self-Study and the 10-Year Accreditation Site Visit are provided in the *ACGME Manual of Policies and Procedures*. Additionally, a description of the Self-Study process, as well as information on how to prepare for the 10-Year Accreditation Site Visit, is available on the ACGME website.

---

***V.C.3.***    ***One goal of ACGME-accredited education is to educate physicians who seek and achieve board certification. One measure of the effectiveness of the educational program is the ultimate pass rate.***

        ***The program director should encourage all eligible program graduates to take the certifying examination offered by the applicable American Board of Medical Specialties (ABMS) member board or American Osteopathic Association (AOA) certifying board.***

**V.C.3.a)**      **For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual written exam, in the preceding three years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** <sup>(Outcome)</sup>

**V.C.3.b)**   **For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial written exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** (Outcome)

**V.C.3.c)**   **For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual oral exam, in the preceding three years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** (Outcome)

**V.C.3.d)**   **For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial oral exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty.** (Outcome)

**V.C.3.e)**   **For each of the exams referenced in V.C.3.a)-d), any program whose graduates over the time period specified in the requirement have achieved an 80 percent pass rate will have met this requirement, no matter the percentile rank of the program for pass rate in that specialty.** (Outcome)

---

**Background and Intent:** Setting a single standard for pass rate that works across specialties is not supportable based on the heterogeneity of the psychometrics of different examinations. By using a percentile rank, the performance of the lower five percent (fifth percentile) of programs can be identified and set on a path to curricular and test preparation reform.

There are specialties where there is a very high board pass rate that could leave successful programs in the bottom five percent (fifth percentile) despite admirable performance. These high-performing programs should not be cited, and V.C.3.e) is designed to address this.

---

**V.C.3.f)**   **Programs must report, in ADS, board certification status annually for the cohort of board-eligible residents that graduated seven years earlier.** (Core)

---

**Background and Intent:** It is essential that residency programs demonstrate knowledge and skill transfer to their residents. One measure of that is the qualifying or initial certification exam pass rate. Another important parameter of the success of the program is the ultimate board certification rate of its graduates. Graduates are eligible for up to seven years from residency graduation for initial certification. The ACGME will calculate a rolling three-year average of the ultimate board certification rate at seven years post-graduation, and the Review Committees will monitor it.

---

> **The Review Committees will track the rolling seven-year certification rate as an indicator of program quality. Programs are encouraged to monitor their graduates' performance on board certification examinations.**
>
> **In the future, the ACGME may establish parameters related to ultimate board certification rates.**

VI.     **The Learning and Working Environment**

*Residency education must occur in the context of a learning and working environment that emphasizes the following principles:*

- *Excellence in the safety and quality of care rendered to patients by residents today*

- *Excellence in the safety and quality of care rendered to patients by today's residents in their future practice*

- *Excellence in professionalism through faculty modeling of:*

  - *the effacement of self-interest in a humanistic environment that supports the professional development of physicians*

  - *the joy of curiosity, problem-solving, intellectual rigor, and discovery*

- *Commitment to the well-being of the students, residents, faculty members, and all members of the health care team*

> **Background and Intent: The revised requirements are intended to provide greater flexibility within an established framework, allowing programs and residents more discretion to structure clinical education in a way that best supports the above principles of professional development. With this increased flexibility comes the responsibility for programs and residents to adhere to the 80-hour maximum weekly limit (unless a rotation-specific exception is granted by a Review Committee), and to utilize flexibility in a manner that optimizes patient safety, resident education, and resident well-being. The requirements are intended to support the development of a sense of professionalism by encouraging residents to make decisions based on patient needs and their own well-being, without fear of jeopardizing their program's accreditation status. In addition, the proposed requirements eliminate the burdensome documentation requirement for residents to justify clinical and educational work hour variations.**
>
> **Clinical and educational work hours represent only one part of the larger issue of conditions of the learning and working environment, and Section VI has now been expanded to include greater attention to patient safety and resident and faculty member well-being. The requirements are intended to support programs and residents as they strive for excellence, while also ensuring ethical, humanistic training. Ensuring that flexibility is used in an appropriate manner is a shared responsibility of the program and residents. With this flexibility comes a responsibility for residents and faculty members to recognize the need to hand off care of a patient to another provider when a resident is**

too fatigued to provide safe, high quality care and for programs to ensure that residents remain within the 80-hour maximum weekly limit.

**VI.A.** **Patient Safety, Quality Improvement, Supervision, and Accountability**

**VI.A.1.** **Patient Safety and Quality Improvement**

*All physicians share responsibility for promoting patient safety and enhancing quality of patient care. Graduate medical education must prepare residents to provide the highest level of clinical care with continuous focus on the safety, individual needs, and humanity of their patients. It is the right of each patient to be cared for by residents who are appropriately supervised; possess the requisite knowledge, skills, and abilities; understand the limits of their knowledge and experience; and seek assistance as required to provide optimal patient care.*

*Residents must demonstrate the ability to analyze the care they provide, understand their roles within health care teams, and play an active role in system improvement processes. Graduating residents will apply these skills to critique their future unsupervised practice and effect quality improvement measures.*

*It is necessary for residents and faculty members to consistently work in a well-coordinated manner with other health care professionals to achieve organizational patient safety goals.*

**VI.A.1.a)** **Patient Safety**

**VI.A.1.a).(1)** **Culture of Safety**

*A culture of safety requires continuous identification of vulnerabilities and a willingness to transparently deal with them. An effective organization has formal mechanisms to assess the knowledge, skills, and attitudes of its personnel toward safety in order to identify areas for improvement.*

**VI.A.1.a).(1).(a)** The program, its faculty, residents, and fellows must actively participate in patient safety systems and contribute to a culture of safety. **(Core)**

**VI.A.1.a).(1).(b)** The program must have a structure that promotes safe, interprofessional, team-based care. **(Core)**

**VI.A.1.a).(2)** **Education on Patient Safety**

**Programs must provide formal educational activities that promote patient safety-related goals, tools, and techniques.** (Core)

---

Background and Intent: Optimal patient safety occurs in the setting of a coordinated interprofessional learning and working environment.

---

[The Review Committee may further specify]

VI.A.1.a).(3)  **Patient Safety Events**

*Reporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety, and are essential for the success of any patient safety program. Feedback and experiential learning are essential to developing true competence in the ability to identify causes and institute sustainable systems-based changes to ameliorate patient safety vulnerabilities.*

VI.A.1.a).(3).(a)  **Residents, fellows, faculty members, and other clinical staff members must:**

VI.A.1.a).(3).(a).(i)  **know their responsibilities in reporting patient safety events at the clinical site;** (Core)

VI.A.1.a).(3).(a).(ii)  **know how to report patient safety events, including near misses, at the clinical site; and,** (Core)

VI.A.1.a).(3).(a).(iii)  **be provided with summary information of their institution's patient safety reports.** (Core)

VI.A.1.a).(3).(b)  **Residents must participate as team members in real and/or simulated interprofessional clinical patient safety activities, such as root cause analyses or other activities that include analysis, as well as formulation and implementation of actions.** (Core)

VI.A.1.a).(4)  **Resident Education and Experience in Disclosure of Adverse Events**

*Patient-centered care requires patients, and when appropriate families, to be apprised of clinical situations that affect them, including adverse events. This is an important skill for faculty physicians to model, and for residents to develop and apply.*

VI.A.1.a).(4).(a)     **All residents must receive training in how to disclose adverse events to patients and families.** (Core)

VI.A.1.a).(4).(b)     **Residents should have the opportunity to participate in the disclosure of patient safety events, real or simulated.** (Detail)†

VI.A.1.b)     **Quality Improvement**

VI.A.1.b).(1)     **Education in Quality Improvement**

        ***A cohesive model of health care includes quality-related goals, tools, and techniques that are necessary in order for health care professionals to achieve quality improvement goals.***

VI.A.1.b).(1).(a)     **Residents must receive training and experience in quality improvement processes, including an understanding of health care disparities.** (Core)

VI.A.1.b).(2)     **Quality Metrics**

        ***Access to data is essential to prioritizing activities for care improvement and evaluating success of improvement efforts.***

VI.A.1.b).(2).(a)     **Residents and faculty members must receive data on quality metrics and benchmarks related to their patient populations.** (Core)

VI.A.1.b).(3)     **Engagement in Quality Improvement Activities**

        ***Experiential learning is essential to developing the ability to identify and institute sustainable systems-based changes to improve patient care.***

VI.A.1.b).(3).(a)     **Residents must have the opportunity to participate in interprofessional quality improvement activities.** (Core)

VI.A.1.b).(3).(a).(i)     **This should include activities aimed at reducing health care disparities.** (Detail)

        **[The Review Committee may further specify under any requirement in VI.A.1.b)-VI.A.1.b).(3).(a).(i)]**

VI.A.2.     **Supervision and Accountability**

**VI.A.2.a)**
*Although the attending physician is ultimately responsible for the care of the patient, every physician shares in the responsibility and accountability for their efforts in the provision of care. Effective programs, in partnership with their Sponsoring Institutions, define, widely communicate, and monitor a structured chain of responsibility and accountability as it relates to the supervision of all patient care.*

*Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.*

**VI.A.2.a).(1)**
**Each patient must have an identifiable and appropriately-credentialed and privileged attending physician (or licensed independent practitioner as specified by the applicable Review Committee) who is responsible and accountable for the patient's care.** (Core)

**VI.A.2.a).(1).(a)**
**This information must be available to residents, faculty members, other members of the health care team, and patients.** (Core)

**VI.A.2.a).(1).(b)**
**Residents and faculty members must inform each patient of their respective roles in that patient's care when providing direct patient care.** (Core)

**VI.A.2.b)**
*Supervision may be exercised through a variety of methods. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the appropriate availability of the supervising faculty member, fellow, or senior resident physician, either on site or by means of telecommunication technology. Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback.*

> **Background and Intent:** Appropriate supervision is essential for patient safety and high-quality teaching. Supervision is also contextual. There is tremendous diversity of resident patient interactions, education and training locations, and resident skills and abilities even at the same level of the educational program. The degree of supervision is expected to evolve progressively as a resident gains more experience, even with the same patient condition or procedure. All residents have a level of supervision commensurate with their level of autonomy in practice; this level of supervision may be enhanced based on factors such as patient safety, complexity, acuity, urgency, risk of serious adverse events, or other pertinent variables.

VI.A.2.b).(1)                    **The program must demonstrate that the appropriate level of supervision in place for all residents is based on each resident's level of training and ability, as well as patient complexity and acuity. Supervision may be exercised through a variety of methods, as appropriate to the situation.** (Core)

**[The Review Committee may specify which activities require different levels of supervision.]**

VI.A.2.b).(2)                    **The program must define when physical presence of a supervising physician is required.** (Core)

VI.A.2.c)          **Levels of Supervision**

**To promote appropriate resident supervision while providing for graded authority and responsibility, the program must use the following classification of supervision:** (Core)

VI.A.2.c).(1)                    **Direct Supervision:**

VI.A.2.c).(1).(a)                    **the supervising physician is physically present with the resident during the key portions of the patient interaction; or,** (Core)

**[The Review Committee may further specify]**

VI.A.2.c).(1).(a).(i)                    **PGY-1 residents must initially be supervised directly, only as described in VI.A.2.c).(1).(a).** (Core)

**[The Review Committee may describe the conditions under which PGY-1 residents progress to be supervised indirectly]**

VI.A.2.c).(1).(b)                    **the supervising physician and/or patient is not physically present with the resident and the supervising physician is concurrently monitoring the patient care through appropriate telecommunication technology.** (Core)

**[The Review Committee may further specify]**

**[The RC may choose not to permit VI.A.2.c).(1).(b)]**

**VI.A.2.c).(2)**      Indirect Supervision: the supervising physician is not providing physical or concurrent visual or audio supervision but is immediately available to the resident for guidance and is available to provide appropriate direct supervision. (Core)

**VI.A.2.c).(3)**      Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered. (Core)

**VI.A.2.d)**      The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members. (Core)

**VI.A.2.d).(1)**      The program director must evaluate each resident's abilities based on specific criteria, guided by the Milestones. (Core)

**VI.A.2.d).(2)**      Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident. (Core)

**VI.A.2.d).(3)**      Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow. (Detail)

**VI.A.2.e)**      Programs must set guidelines for circumstances and events in which residents must communicate with the supervising faculty member(s). (Core)

**VI.A.2.e).(1)**      Each resident must know the limits of their scope of authority, and the circumstances under which the resident is permitted to act with conditional independence. (Outcome)

Background and Intent: The ACGME Glossary of Terms defines conditional independence as: Graded, progressive responsibility for patient care with defined oversight.

**VI.A.2.f)**      Faculty supervision assignments must be of sufficient duration to assess the knowledge and skills of each resident and to delegate to the resident the appropriate level of patient care authority and responsibility. (Core)

**VI.B.**      **Professionalism**

**VI.B.1.**     Programs, in partnership with their Sponsoring Institutions, must educate residents and faculty members concerning the professional responsibilities of physicians, including their obligation to be appropriately rested and fit to provide the care required by their patients. (Core)

**VI.B.2.**     The learning objectives of the program must:

**VI.B.2.a)**     be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; (Core)

**VI.B.2.b)**     be accomplished without excessive reliance on residents to fulfill non-physician obligations; and, (Core)

---

Background and Intent: Routine reliance on residents to fulfill non-physician obligations increases work compression for residents and does not provide an optimal educational experience. Non-physician obligations are those duties which in most institutions are performed by nursing and allied health professionals, transport services, or clerical staff. Examples of such obligations include transport of patients from the wards or units for procedures elsewhere in the hospital; routine blood drawing for laboratory tests; routine monitoring of patients when off the ward; and clerical duties, such as scheduling. While it is understood that residents may be expected to do any of these things on occasion when the need arises, these activities should not be performed by residents routinely and must be kept to a minimum to optimize resident education.

---

**VI.B.2.c)**     ensure manageable patient care responsibilities. (Core)

     [The Review Committee may further specify]

---

Background and Intent: The Common Program Requirements do not define "manageable patient care responsibilities" as this is variable by specialty and PGY level. Review Committees will provide further detail regarding patient care responsibilities in the applicable specialty-specific Program Requirements and accompanying FAQs. However, all programs, regardless of specialty, should carefully assess how the assignment of patient care responsibilities can affect work compression, especially at the PGY-1 level.

---

**VI.B.3.**     The program director, in partnership with the Sponsoring Institution, must provide a culture of professionalism that supports patient safety and personal responsibility. (Core)

**VI.B.4.**     Residents and faculty members must demonstrate an understanding of their personal role in the:

**VI.B.4.a)**     provision of patient- and family-centered care; (Outcome)

**VI.B.4.b)**     safety and welfare of patients entrusted to their care, including the ability to report unsafe conditions and adverse events; (Outcome)

> **Background and Intent:** This requirement emphasizes that responsibility for reporting unsafe conditions and adverse events is shared by all members of the team and is not solely the responsibility of the resident.

**VI.B.4.c)**  assurance of their fitness for work, including: (Outcome)

> **Background and Intent:** This requirement emphasizes the professional responsibility of faculty members and residents to arrive for work adequately rested and ready to care for patients. It is also the responsibility of faculty members, residents, and other members of the care team to be observant, to intervene, and/or to escalate their concern about resident and faculty member fitness for work, depending on the situation, and in accordance with institutional policies.

**VI.B.4.c).(1)**  management of their time before, during, and after clinical assignments; and, (Outcome)

**VI.B.4.c).(2)**  recognition of impairment, including from illness, fatigue, and substance use, in themselves, their peers, and other members of the health care team. (Outcome)

**VI.B.4.d)**  commitment to lifelong learning; (Outcome)

**VI.B.4.e)**  monitoring of their patient care performance improvement indicators; and, (Outcome)

**VI.B.4.f)**  accurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data. (Outcome)

**VI.B.5.**  All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. This includes the recognition that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider. (Outcome)

**VI.B.6.**  Programs, in partnership with their Sponsoring Institutions, must provide a professional, equitable, respectful, and civil environment that is free from discrimination, sexual and other forms of harassment, mistreatment, abuse, or coercion of students, residents, faculty, and staff. (Core)

**VI.B.7.**  Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns. (Core)

**VI.C.**  **Well-Being**

*Psychological, emotional, and physical well-being are critical in the development of the competent, caring, and resilient physician and require*

*proactive attention to life inside and outside of medicine. Well-being requires that physicians retain the joy in medicine while managing their own real-life stresses. Self-care and responsibility to support other members of the health care team are important components of professionalism; they are also skills that must be modeled, learned, and nurtured in the context of other aspects of residency training.*

*Residents and faculty members are at risk for burnout and depression. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well-being as other aspects of resident competence. Physicians and all members of the health care team share responsibility for the well-being of each other. For example, a culture which encourages covering for colleagues after an illness without the expectation of reciprocity reflects the ideal of professionalism. A positive culture in a clinical learning environment models constructive behaviors, and prepares residents with the skills and attitudes needed to thrive throughout their careers.*

---

**Background and Intent:** The ACGME is committed to addressing physician well-being for individuals and as it relates to the learning and working environment. The creation of a learning and working environment with a culture of respect and accountability for physician well-being is crucial to physicians' ability to deliver the safest, best possible care to patients. The ACGME is leveraging its resources in four key areas to support the ongoing focus on physician well-being: education, influence, research, and collaboration. Information regarding the ACGME's ongoing efforts in this area is available on the ACGME website.

As these efforts evolve, information will be shared with programs seeking to develop and/or strengthen their own well-being initiatives. In addition, there are many activities that programs can utilize now to assess and support physician well-being. These include culture of safety surveys, ensuring the availability of counseling services, and attention to the safety of the entire health care team.

---

**VI.C.1.**    The responsibility of the program, in partnership with the Sponsoring Institution, to address well-being must include:

**VI.C.1.a)**    efforts to enhance the meaning that each resident finds in the experience of being a physician, including protecting time with patients, minimizing non-physician obligations, providing administrative support, promoting progressive autonomy and flexibility, and enhancing professional relationships; (Core)

**VI.C.1.b)**    attention to scheduling, work intensity, and work compression that impacts resident well-being; (Core)

**VI.C.1.c)**    evaluating workplace safety data and addressing the safety of residents and faculty members; (Core)

> **Background and Intent:** This requirement emphasizes the responsibility shared by the Sponsoring Institution and its programs to gather information and utilize systems that monitor and enhance resident and faculty member safety, including physical safety. Issues to be addressed include, but are not limited to, monitoring of workplace injuries, physical or emotional violence, vehicle collisions, and emotional well-being after adverse events.

VI.C.1.d)                                 policies and programs that encourage optimal resident and
                                          faculty member well-being; and, [(Core)]

> **Background and Intent:** Well-being includes having time away from work to engage with family and friends, as well as to attend to personal needs and to one's own health, including adequate rest, healthy diet, and regular exercise.

VI.C.1.d).(1)                             Residents must be given the opportunity to attend
                                          medical, mental health, and dental care appointments,
                                          including those scheduled during their working hours.
                                          [(Core)]

> **Background and Intent:** The intent of this requirement is to ensure that residents have the opportunity to access medical and dental care, including mental health care, at times that are appropriate to their individual circumstances. Residents must be provided with time away from the program as needed to access care, including appointments scheduled during their working hours.

VI.C.1.e)                                 attention to resident and faculty member burnout,
                                          depression, and substance use disorders. The program, in
                                          partnership with its Sponsoring Institution, must educate
                                          faculty members and residents in identification of the
                                          symptoms of burnout, depression, and substance use
                                          disorders, including means to assist those who experience
                                          these conditions. Residents and faculty members must also
                                          be educated to recognize those symptoms in themselves and
                                          how to seek appropriate care. The program, in partnership
                                          with its Sponsoring Institution, must: [(Core)]

> **Background and Intent:** Programs and Sponsoring Institutions are encouraged to review materials in order to create systems for identification of burnout, depression, and substance use disorders. Materials and more information are available on the Physician Well-being section of the ACGME website (http://www.acgme.org/What-We-Do/Initiatives/Physician-Well-Being).

VI.C.1.e).(1)                             encourage residents and faculty members to alert the
                                          program director or other designated personnel or
                                          programs when they are concerned that another
                                          resident, fellow, or faculty member may be displaying
                                          signs of burnout, depression, a substance use
                                          disorder, suicidal ideation, or potential for violence;
                                          [(Core)]

> **Background and Intent:** Individuals experiencing burnout, depression, a substance use disorder, and/or suicidal ideation are often reluctant to reach out for help due to the stigma associated with these conditions, and are concerned that seeking help may have a negative impact on their career. Recognizing that physicians are at increased risk in these areas, it is essential that residents and faculty members are able to report their concerns when another resident or faculty member displays signs of any of these conditions, so that the program director or other designated personnel, such as the department chair, may assess the situation and intervene as necessary to facilitate access to appropriate care. Residents and faculty members must know which personnel, in addition to the program director, have been designated with this responsibility; those personnel and the program director should be familiar with the institution's impaired physician policy and any employee health, employee assistance, and/or wellness programs within the institution. In cases of physician impairment, the program director or designated personnel should follow the policies of their institution for reporting.

VI.C.1.e).(2)                    provide access to appropriate tools for self-screening; and, (Core)

VI.C.1.e).(3)                    provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week. (Core)

> **Background and Intent:** The intent of this requirement is to ensure that residents have immediate access at all times to a mental health professional (psychiatrist, psychologist, Licensed Clinical Social Worker, Primary Mental Health Nurse Practitioner, or Licensed Professional Counselor) for urgent or emergent mental health issues. In-person, telemedicine, or telephonic means may be utilized to satisfy this requirement. Care in the Emergency Department may be necessary in some cases, but not as the primary or sole means to meet the requirement.
>
> The reference to affordable counseling is intended to require that financial cost not be a barrier to obtaining care.

VI.C.2.           There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, family emergencies, and parental leave. Each program must allow an appropriate length of absence for residents unable to perform their patient care responsibilities. (Core)

VI.C.2.a)          The program must have policies and procedures in place to ensure coverage of patient care. (Core)

VI.C.2.b)          These policies must be implemented without fear of negative consequences for the resident who is or was unable to provide the clinical work. (Core)

> **Background and Intent:** Residents may need to extend their length of training depending on length of absence and specialty board eligibility requirements.

> Teammates should assist colleagues in need and equitably reintegrate them upon return.

**VI.D.**      **Fatigue Mitigation**

**VI.D.1.**      Programs must:

**VI.D.1.a)**      educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation; (Core)

**VI.D.1.b)**      educate all faculty members and residents in alertness management and fatigue mitigation processes; and, (Core)

**VI.D.1.c)**      encourage residents to use fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning. (Detail)

> Background and Intent: Providing medical care to patients is physically and mentally demanding. Night shifts, even for those who have had enough rest, cause fatigue. Experiencing fatigue in a supervised environment during training prepares residents for managing fatigue in practice. It is expected that programs adopt fatigue mitigation processes and ensure that there are no negative consequences and/or stigma for using fatigue mitigation strategies.
>
> This requirement emphasizes the importance of adequate rest before and after clinical responsibilities. Strategies that may be used include, but are not limited to, strategic napping; the judicious use of caffeine; availability of other caregivers; time management to maximize sleep off-duty; learning to recognize the signs of fatigue, and self-monitoring performance and/or asking others to monitor performance; remaining active to promote alertness; maintaining a healthy diet; using relaxation techniques to fall asleep; maintaining a consistent sleep routine; exercising regularly; increasing sleep time before and after call; and ensuring sufficient sleep recovery periods.

**VI.D.2.**      Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2–VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue. (Core)

**VI.D.3.**      The program, in partnership with its Sponsoring Institution, must ensure adequate sleep facilities and safe transportation options for residents who may be too fatigued to safely return home. (Core)

**VI.E.**      **Clinical Responsibilities, Teamwork, and Transitions of Care**

**VI.E.1.**      Clinical Responsibilities

The clinical responsibilities for each resident must be based on PGY level, patient safety, resident ability, severity and complexity of patient illness/condition, and available support services. (Core)

**[Optimal clinical workload may be further specified by each Review Committee]**

> **Background and Intent:** The changing clinical care environment of medicine has meant that work compression due to high complexity has increased stress on residents. Faculty members and program directors need to make sure residents function in an environment that has safe patient care and a sense of resident well-being. Some Review Committees have addressed this by setting limits on patient admissions, and it is an essential responsibility of the program director to monitor resident workload. Workload should be distributed among the resident team and interdisciplinary teams to minimize work compression.

**VI.E.2.**      **Teamwork**

Residents must care for patients in an environment that maximizes communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty and larger health system. (Core)

**[The Review Committee may further specify]**

**VI.E.3.**      **Transitions of Care**

**VI.E.3.a)**      Programs must design clinical assignments to optimize transitions in patient care, including their safety, frequency, and structure. (Core)

**VI.E.3.b)**      Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety. (Core)

**VI.E.3.c)**      Programs must ensure that residents are competent in communicating with team members in the hand-over process. (Outcome)

**VI.E.3.d)**      Programs and clinical sites must maintain and communicate schedules of attending physicians and residents currently responsible for care. (Core)

**VI.E.3.e)**      Each program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in VI.C.2-VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue or illness, or family emergency. (Core)

**VI.F.**      **Clinical Experience and Education**

*Programs, in partnership with their Sponsoring Institutions, must design an effective program structure that is configured to provide residents with*

*educational and clinical experience opportunities, as well as reasonable opportunities for rest and personal activities.*

---

**Background and Intent: In the new requirements, the terms "clinical experience and education," "clinical and educational work," and "clinical and educational work hours" replace the terms "duty hours," "duty periods," and "duty." These changes have been made in response to concerns that the previous use of the term "duty" in reference to number of hours worked may have led some to conclude that residents' duty to "clock out" on time superseded their duty to their patients.**

---

VI.F.1.                      Maximum Hours of Clinical and Educational Work per Week

**Clinical and educational work hours must be limited to no more than 80 hours per week, averaged over a four-week period, inclusive of all in-house clinical and educational activities, clinical work done from home, and all moonlighting. (Core)**

---

**Background and Intent: Programs and residents have a shared responsibility to ensure that the 80-hour maximum weekly limit is not exceeded. While the requirement has been written with the intent of allowing residents to remain beyond their scheduled work periods to care for a patient or participate in an educational activity, these additional hours must be accounted for in the allocated 80 hours when averaged over four weeks.**

***Scheduling***
**While the ACGME acknowledges that, on rare occasions, a resident may work in excess of 80 hours in a given week, all programs and residents utilizing this flexibility will be required to adhere to the 80-hour maximum weekly limit when averaged over a four-week period. Programs that regularly schedule residents to work 80 hours per week and still permit residents to remain beyond their scheduled work period are likely to exceed the 80-hour maximum, which would not be in substantial compliance with the requirement. These programs should adjust schedules so that residents are scheduled to work fewer than 80 hours per week, which would allow residents to remain beyond their scheduled work period when needed without violating the 80-hour requirement. Programs may wish to consider using night float and/or making adjustments to the frequency of in-house call to ensure compliance with the 80-hour maximum weekly limit.**

***Oversight***
**With increased flexibility introduced into the Requirements, programs permitting this flexibility will need to account for the potential for residents to remain beyond their assigned work periods when developing schedules, to avoid exceeding the 80-hour maximum weekly limit, averaged over four weeks. The ACGME Review Committees will strictly monitor and enforce compliance with the 80-hour requirement. Where violations of the 80-hour requirement are identified, programs will be subject to citation and at risk for an adverse accreditation action.**

***Work from Home***
**While the requirement specifies that clinical work done from home must be counted toward the 80-hour maximum weekly limit, the expectation remains that scheduling be structured so that residents are able to complete most work on site during scheduled clinical work hours without requiring them to take work home. The new requirements**

---

acknowledge the changing landscape of medicine, including electronic health records, and the resulting increase in the amount of work residents choose to do from home. The requirement provides flexibility for residents to do this while ensuring that the time spent by residents completing clinical work from home is accomplished within the 80-hour weekly maximum. Types of work from home that must be counted include using an electronic health record and taking calls from home. Reading done in preparation for the following day's cases, studying, and research done from home do not count toward the 80 hours. Resident decisions to leave the hospital before their clinical work has been completed and to finish that work later from home should be made in consultation with the resident's supervisor. In such circumstances, residents should be mindful of their professional responsibility to complete work in a timely manner and to maintain patient confidentiality.

During the public comment period many individuals raised questions and concerns related to this change. Some questioned whether minute by minute tracking would be required; in other words, if a resident spends three minutes on a phone call and then a few hours later spends two minutes on another call, will the resident need to report that time. Others raised concerns related to the ability of programs and institutions to verify the accuracy of the information reported by residents. The new requirements are not an attempt to micromanage this process. Residents are to track the time they spend on clinical work from home and to report that time to the program. Decisions regarding whether to report infrequent phone calls of very short duration will be left to the individual resident. Programs will need to factor in time residents are spending on clinical work at home when schedules are developed to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks. There is no requirement that programs assume responsibility for documenting this time. Rather, the program's responsibility is ensuring that residents report their time from home and that schedules are structured to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks.

*PGY-1 and PGY-2 Residents*
PGY-1 and PGY-2 residents may not have the experience to make decisions about when it is appropriate to utilize flexibility or may feel pressured to use it when unnecessary. Programs are responsible for ensuring that residents are provided with manageable workloads that can be accomplished during scheduled work hours. This includes ensuring that a resident's assigned direct patient load is manageable, that residents have appropriate support from their clinical teams, and that residents are not overburdened with clerical work and/or other non-physician duties.

VI.F.2.          Mandatory Time Free of Clinical Work and Education

VI.F.2.a)          The program must design an effective program structure that is configured to provide residents with educational opportunities, as well as reasonable opportunities for rest and personal well-being. (Core)

VI.F.2.b)          Residents should have eight hours off between scheduled clinical work and education periods. (Detail)

VI.F.2.b).(1)          There may be circumstances when residents choose to stay to care for their patients or return to the

**hospital with fewer than eight hours free of clinical experience and education. This must occur within the context of the 80-hour and the one-day-off-in-seven requirements.** (Detail)

Background and Intent: While it is expected that resident schedules will be structured to ensure that residents are provided with a minimum of eight hours off between scheduled work periods, it is recognized that residents may choose to remain beyond their scheduled time, or return to the clinical site during this time-off period, to care for a patient. The requirement preserves the flexibility for residents to make those choices. It is also noted that the 80-hour weekly limit (averaged over four weeks) is a deterrent for scheduling fewer than eight hours off between clinical and education work periods, as it would be difficult for a program to design a schedule that provides fewer than eight hours off without violating the 80-hour rule.

VI.F.2.c)          **Residents must have at least 14 hours free of clinical work and education after 24 hours of in-house call.** (Core)

Background and Intent: Residents have a responsibility to return to work rested, and thus are expected to use this time away from work to get adequate rest. In support of this goal, residents are encouraged to prioritize sleep over other discretionary activities.

VI.F.2.d)          **Residents must be scheduled for a minimum of one day in seven free of clinical work and required education (when averaged over four weeks). At-home call cannot be assigned on these free days.** (Core)

Background and Intent: The requirement provides flexibility for programs to distribute days off in a manner that meets program and resident needs. It is strongly recommended that residents' preference regarding how their days off are distributed be considered as schedules are developed. It is desirable that days off be distributed throughout the month, but some residents may prefer to group their days off to have a "golden weekend," meaning a consecutive Saturday and Sunday free from work. The requirement for one free day in seven should not be interpreted as precluding a golden weekend. Where feasible, schedules may be designed to provide residents with a weekend, or two consecutive days, free of work. The applicable Review Committee will evaluate the number of consecutive days of work and determine whether they meet educational objectives. Programs are encouraged to distribute days off in a fashion that optimizes resident well-being, and educational and personal goals. It is noted that a day off is defined in the ACGME Glossary of Terms as "one (1) continuous 24-hour period free from all administrative, clinical, and educational activities."

VI.F.3.          **Maximum Clinical Work and Education Period Length**

VI.F.3.a)          **Clinical and educational work periods for residents must not exceed 24 hours of continuous scheduled clinical assignments.** (Core)

Background and Intent: The Task Force examined the question of "consecutive time on task." It examined the research supporting the current limit of 16 consecutive hours of

time on task for PGY-1 residents; the range of often conflicting impacts of this requirement on patient safety, clinical care, and continuity of care by resident teams; and resident learning found in the literature. Finally, it heard a uniform request by the specialty societies, certifying boards, membership societies and organizations, and senior residents to repeal this requirement. It heard conflicting perspectives from resident unions, a medical student association, and a number of public advocacy groups, some arguing for continuation of the requirement, others arguing for extension of the requirement to all residents.

Of greatest concern to the Task Force were the observations of disruption of team care and patient care continuity brought about with residents beyond the PGY-1 level adhering to differing requirements. The graduate medical education community uniformly requested that the Task Force remove this requirement. The most frequently-cited reason for this request was the complete disruption of the team, separating the PGY-1 from supervisory faculty members and residents who were best able to judge the ability of the resident and customize the supervision of patient care for each PGY-1. Cited nearly as frequently was the separation of the PGY-1 from the team, delaying maturation of clinical skills, and threatening to create a "shift" mentality in disciplines where overnight availability to patients is essential in delivery of care.

The Task Force examined the impact of the request to consider 16-consecutive-hour limits for all residents, and rejected the proposition. It found that model incompatible with the actual practice of medicine and surgery in many specialties, excessively limiting in configuration of clinical services in many disciplines, and potentially disruptive of the inculcation of responsibility and professional commitment to altruism and placing the needs of patients above those of the physician.

After careful consideration of the information available, the testimony and position of all parties submitting information, and presentations to the Task Force, the Task Force removed the 16-hour-consecutive-time-on-task requirement for PGY-1 residents. It remains crucial that programs ensure that PGY-1 residents are supervised in compliance with the applicable Program Requirements, and that resident well-being is prioritized as described in Section VI.C. of these requirements.

| VI.F.3.a).(1) | Up to four hours of additional time may be used for activities related to patient safety, such as providing effective transitions of care, and/or resident education. (Core) |
|---|---|
| VI.F.3.a).(1).(a) | Additional patient care responsibilities must not be assigned to a resident during this time. (Core) |

Background and Intent: The additional time referenced in VI.F.3.a).(1) should not be used for the care of new patients. It is essential that the resident continue to function as a member of the team in an environment where other members of the team can assess resident fatigue, and that supervision for post-call residents is provided. This 24 hours and up to an additional four hours must occur within the context of 80-hour weekly limit, averaged over four weeks.

| VI.F.4. | Clinical and Educational Work Hour Exceptions |
|---|---|

**VI.F.4.a)**  In rare circumstances, after handing off all other responsibilities, a resident, on their own initiative, may elect to remain or return to the clinical site in the following circumstances:

**VI.F.4.a).(1)**  to continue to provide care to a single severely ill or unstable patient; (Detail)

**VI.F.4.a).(2)**  humanistic attention to the needs of a patient or family; or, (Detail)

**VI.F.4.a).(3)**  to attend unique educational events. (Detail)

**VI.F.4.b)**  These additional hours of care or education will be counted toward the 80-hour weekly limit. (Detail)

Background and Intent: This requirement is intended to provide residents with some control over their schedules by providing the flexibility to voluntarily remain beyond the scheduled responsibilities under the circumstances described above. It is important to note that a resident may remain to attend a conference, or return for a conference later in the day, only if the decision is made voluntarily. Residents must not be required to stay. Programs allowing residents to remain or return beyond the scheduled work and clinical education period must ensure that the decision to remain is initiated by the resident and that residents are not coerced. This additional time must be counted toward the 80-hour maximum weekly limit.

**VI.F.4.c)**  A Review Committee may grant rotation-specific exceptions for up to 10 percent or a maximum of 88 clinical and educational work hours to individual programs based on a sound educational rationale.

**VI.F.4.c).(1)**  In preparing a request for an exception, the program director must follow the clinical and educational work hour exception policy from the *ACGME Manual of Policies and Procedures*. (Core)

**VI.F.4.c).(2)**  Prior to submitting the request to the Review Committee, the program director must obtain approval from the Sponsoring Institution's GMEC and DIO. (Core)

Background and Intent: The provision for exceptions for up to 88 hours per week has been modified to specify that exceptions may be granted for specific rotations if the program can justify the increase based on criteria specified by the Review Committee. As in the past, Review Committees may opt not to permit exceptions. The underlying philosophy for this requirement is that while it is expected that all residents should be able to train within an 80-hour work week, it is recognized that some programs may include rotations with alternate structures based on the nature of the specialty. DIO/GMEC approval is required before the request will be considered by the Review Committee.

VI.F.5.            **Moonlighting**

VI.F.5.a)                    **Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program, and must not interfere with the resident's fitness for work nor compromise patient safety. (Core)**

VI.F.5.b)                    **Time spent by residents in internal and external moonlighting (as defined in the ACGME Glossary of Terms) must be counted toward the 80-hour maximum weekly limit. (Core)**

VI.F.5.c)                    **PGY-1 residents are not permitted to moonlight. (Core)**

**Background and Intent: For additional clarification of the expectations related to moonlighting, please refer to the Common Program Requirement FAQs (available at http://www.acgme.org/What-We-Do/Accreditation/Common-Program-Requirements).**

VI.F.6.            **In-House Night Float**

                    **Night float must occur within the context of the 80-hour and one-day-off-in-seven requirements. (Core)**

                    **[The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]**

**Background and Intent: The requirement for no more than six consecutive nights of night float was removed to provide programs with increased flexibility in scheduling.**

VI.F.7.            **Maximum In-House On-Call Frequency**

                    **Residents must be scheduled for in-house call no more frequently than every third night (when averaged over a four-week period). (Core)**

VI.F.8.            **At-Home Call**

VI.F.8.a)                    **Time spent on patient care activities by residents on at-home call must count toward the 80-hour maximum weekly limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one day in seven free of clinical work and education, when averaged over four weeks. (Core)**

VI.F.8.a).(1)                    **At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident. (Core)**

VI.F.8.b)                    **Residents are permitted to return to the hospital while on at-home call to provide direct care for new or established**

**patients. These hours of inpatient patient care must be included in the 80-hour maximum weekly limit.** (Detail)

**[The Review Committee may further specify under any requirement in VI.F.-VI.F.8.b)]**

---

**Background and Intent: This requirement has been modified to specify that clinical work done from home when a resident is taking at-home call must count toward the 80-hour maximum weekly limit. This change acknowledges the often significant amount of time residents devote to clinical activities when taking at-home call, and ensures that taking at-home call does not result in residents routinely working more than 80 hours per week. At-home call activities that must be counted include responding to phone calls and other forms of communication, as well as documentation, such as entering notes in an electronic health record. Activities such as reading about the next day's case, studying, or research activities do not count toward the 80-hour weekly limit.**

**In their evaluation of residency/fellowship programs, Review Committees will look at the overall impact of at-home call on resident/fellow rest and personal time.**

---

\*\*\*

*Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.

†**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

‡**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**Osteopathic Recognition**

For programs with or applying for Osteopathic Recognition, the Osteopathic Recognition Requirements also apply (www.acgme.org/OsteopathicRecognition).