## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CONNOR TRUE, M.D.,

      Plaintiff,

                      CASE NO. 6:22-cv-00220-CEM-GJK

vs.

THE NEMOURS FOUNDATION, a
Florida Not-For-Profit Corporation,

      Defendant.

_____/

### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT
### *And Incorporated Memorandum of Law*

Defendant, THE NEMOURS FOUNDATION ("Nemours"), by and through its undersigned counsel and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, hereby files its Motion to Dismiss the Complaint and Demand for Jury Trial (the "Complaint") (Doc. 1) filed by Plaintiff, CONNOR TRUE, M.D. ("Dr. True").  For the reasons set forth below, Dr. True's Complaint should be dismissed in full and with prejudice.

### PRELIMINARY STATEMENT

Dr. True worked as a Pediatric Resident with Nemours.  After a number of hospitalist attending physicians tasked with evaluating Dr. True's performance noted concerns about his suddenly erratic behavior in December of 2020, he submitted to a reasonable suspicion drug test and tested positive

4881-1319-7842.3

for marijuana.  Dr. True does not dispute these test results and admits that he was in fact utilizing marijuana at or around the time of testing.  In light of this positive drug screening, Nemours placed Dr. True on paid administrative leave pending his completion of a professionally-recommended treatment program.  Dr. True did not complete this program and thus remained on leave until his 2020-2021 contract with Nemours expired by its express terms.  Based on this turn of events, Dr. True now claims that he was discriminated against on the basis of an alleged disability (anxiety) and that Nemours breached an alleged contractual obligation to evaluate his performance.

The allegations in Dr. True's Complaint, however, are better characterized as ***admissions*** that ultimately serve to undermine each of his claims against Nemours.  By admitting that he used marijuana and that Nemours placed him on leave as a result of such usage, Dr. True excludes himself from coverage under the very civil rights statutes whose protection he seeks.  Similarly, by admitting that it was Nemours' very evaluation of his performance that led to his drug test, Dr. True fatally undermines his claim that Nemours failed to evaluate his performance.  Finally, by admitting that any damages he claims to have suffered as a result of Nemours' supposed failure to evaluate were actually the result of his failed drug test, and not any alleged lack of evaluation, Dr. True has foreclosed his ability to connect any alleged damages to Nemours' supposed breach.  In sum, and as explained in

more depth below, Dr. True's allegations go a step further than failing to state a claim for relief, effectively serving to *bar* each of his claims against Nemours. As a result, Dr. True's Complaint is due to be dismissed in full and with prejudice.

## DR. TRUE'S ALLEGATIONS[1]

**A.    Dr. True Worked For Nemours As A Pediatric Resident And Was Subject To The Terms And Conditions Of A Graduate Medical Education Agreement.**

Dr. True began working for Nemours in June of 2019 as a Pediatric Resident in the Pediatric Residency Training Program at Nemours Children's Hospital ("NCH") in Orlando, Florida. *See* Complaint at ¶ 9. Dr. True's employment with Nemours was subject to a Graduate Medical Education Agreement ("GEMA"). *See* 2019-2020 GEMA (Doc. 1 at Exhibit C, pp. 25-31); 2020-2021 GEMA (Doc. 1 at Exhibit C, pp. 32-38). Per the 2020-2021 GEMA, the term of Dr. True's "Appointment Period" with Nemours was set to naturally expire on June 30, 2021. *See* 2020-2021 GEMA at Preamble (defining "Termination Date").

---

[1] Nemours takes the allegations in Dr. True's Complaint as true for the purposes of this Motion only and reserves all rights with regards to the same.

4881-1319-7842.3

    **1.**     **Dr. True Agreed To Abide By Nemours' Policies And Was Aware That Failure To Do So Could Result In Disciplinary Action.**

By signing the GEMA, Dr. True agreed to "read, become familiar with and continuously comply with all applicable policies, procedures, and standards of behavior, of [Nemours]; the guidelines established by applicable regulatory or accrediting agencies…; and all applicable laws and regulations…" *See id.* at Section II.4. Dr. True also agreed that his employment was "expressly conditioned upon [his] satisfactory performance of all Program elements" and that "[i]f [his] actions, conduct, or performance…[we]re deemed by the Program Director to be inconsistent with the terms of this Agreement, NCH's or participating institutions' standards of patient care, patient welfare, or the objectives of NCH, or if such actions, conduct, or performance reflects adversely on the Program or NCH or the participating institutions, or disrupts operations at the Program or NCH or the participating institutions, corrective action, including, but not limited to, suspension and termination, may be taken by the Program Director in accordance with the 'Disciplinary Actions' Policy." *See id.* at Section IV.5.

With Dr. True's commitment to abide by Nemours' policies (and acknowledgment that his failure to do so could result in corrective action) in mind, of particular relevance to the instant litigation is Nemours' Drug Free Workplace and Drug Testing Policy (the "Drug-Free Workplace Policy"). A true

4

and correct copy of Nemours' Drug-Free Workplace Policy is attached hereto
as Exhibit 1.[2]  The Drug-Free Workplace Policy makes clear that associates
"may not work or report to work in an impaired condition caused by prescribed
medication(s) or other substances," defined broadly to include "[a]ny substance,
including but not limited to" alcohol, cannabinoids (which includes
cannabis/marijuana), narcotics, the misuse of a prescription drug, and other
substances prohibited by law (among a number of other specifically
enumerated substances).  *See* Drug-Free Workplace Policy at pp. 1, 6.  The
Drug-Free Workplace Policy also provides that Nemours "requires a drug
test…[u]pon reasonable suspicion that an Associate is or was under the

---

[2] In ruling on a motion to dismiss, the Court may consider exhibits attached to the motion "if
the attached document[s are]: 1) central to the plaintiff's claim; and 2) undisputed." *Howard
v. Sec'y of the Army*, No. 3:14-cv-605-J-34JBT, 2015 WL 4496129, at *3 (M.D. Fla. July 23,
2015) (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)); *see also Watson v.
Hillsborough Cty.*, No. 8:16-cv-1940-T-33TBM, 2016 WL 5870216, at *3 (M.D. Fla. Oct. 7,
2016) ("[T]he incorporation by reference doctrine allows a court to consider a document
attached to the pleadings or to a motion to dismiss without converting a Rule 12(b)(6) motion
into a motion for summary judgment if the document is central to the claim and its
authenticity is not challenged.").  In this case, Dr. True has specifically referenced and
attached the GEMA, in which he agreed to abide by Nemours' policies and procedures, to his
Complaint.  Because the GEMA references Nemours' policies, such policies – specifically, the
Drug-Free Workplace Policy – are effectively incorporated by reference.  As a result, it is
proper for the Court to consider Nemours' Drug-Free Workplace Policy in ruling on the
instant Motion to Dismiss.  *See Layne Heavy Civ., Inc. v. Carter & Verplanck, Inc.*, No. 16-cv-
80609, 2018 WL 6303691, at *3 (S.D. Fla. Oct. 31, 2018) (grating motion to dismiss breach of
contract claim, and in doing so considering other agreements incorporated by reference into
underlying contract in dispute).  Moreover, the Drug-Free Workplace Policy is central to Dr.
True's claim in that he admits Nemours placed him on leave in connection with his positive
drug screening.  *See generally* Complaint at ¶¶ 27-33.  However, should the Court decline to
consider the Drug-Free Workplace Policy at this stage, Nemours respectfully requests that
the Court consider the instant Motion on its own merits and not convert the same to a motion
for summary judgment.  *See* Fed. R. Civ. Pro. 12(d).  Dismissal of Dr. True's Complaint is
warranted on its own accord, and nothing in the Drug-Free Workplace Policy itself directly
dictates an otherwise-improper dismissal.

influence of drugs." *See id.* at p. 1.  By entering into the GEMA, Dr. True agreed to be bound by the terms of Nemours' Drug-Free Workplace Policy and to submit to reasonable suspicion testing under the same.

> **2.    Nemours Agreed To Provide Feedback To Dr. True In Accordance With The ACGME Residency Requirements, Which Impose No Specific Limitations On The Timing Or Mode Of Such Feedback.**

The GEMA also provides that "NCH will evaluate, through the Program Director and Program faculty, the educational and professional progress and achievement of Resident/Fellow, in accordance with ACGME [the Accreditation Council for Graduate Medical Education] requirements." *See* 2020-2021 GEMA at Section I.6.  This in mind, Section V.A of the ACGME Residency Requirements lays out the applicable guidelines regarding resident evaluations.  *See* ACGME Common Program Requirements (Residency) (the "ACGME Residency Requirements") (Doc. 1 at Exhibit D, Section V.A at pp. 66-69).  These guidelines are high-level and, at their core, simply require "[fa]culty members [to] directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment."  *See id.* at Section V.A.1.a).  While the ACGME Residency Requirements indicate that "[e]valuation[s] must be documented at the completion of [a resident's] assignment" or rotation, the Requirements do ***not***

6

prescribe any more specific requirements regarding the timing or method of this feedback.  *See id.* at Section V.A.1.b).

## B.   When Dr. True, Who Admits He Used Marijuana, Tested Positive For THC, Nemours Placed Him On Administrative Leave.

In December of 2020, Dr. True alleges that he was called into a meeting with Dr. Amber Hoffman, Nemours' Residency Program Director, and a Human Resources representative.  *See* Complaint at ¶ 18.  During this meeting, Dr. Hoffman explained that Nemours had received a number of complaints about Dr. True's behavior and performance from hospitalist attending physicians.  *See id.*  These complaints had been memorialized in e-mails sent from the hospitalist attending physicians themselves.  *See id.* at ¶ 20.  True and correct copies of the e-mail complaints referenced in Dr. True's Complaint (the "E-mail Complaints") are attached hereto as Exhibit 2.[3]  In particular, Dr. True alleges that these complaints included concerns that he was "abusing stimulants" or "psychiatric medications."  *See id.* at ¶ 19; *see also* E-mail Complaints (indicating concerns that Dr. True was "over-stimulated

---

[3] Because Dr. True references the attached E-mail Complaints, which go to the heart of his claims and whose authenticity he cannot dispute, in his Complaint, it is proper for the Court to consider the E-mail Complaints when ruling on the instant Motion.  *See supra* Note 2; *Jones v. Bank of Am.*, 985 F. Supp. 2d 1320, 1326 (M.D. Fla. 2013) (considering document attached to defendant's motion to dismiss because it was referenced in complaint).  However, as was the case with Nemours' Drug-Free Workplace Policy, Dr. True's Complaint is due to be dismissed with or without specific consideration of the E-mail Complaints, and Nemours respectfully requests that the Court take the instant Motion on its own merits if it declines to consider the E-Mail Complaints.

from medicines or caffeine," that his "speech [was] pressured," and that he "appear[ed] tremulous").

As a result of these complaints, Nemours required Dr. True to undergo a reasonable suspicion drug screen. *See* Complaint at ¶ 23; *see also* Nemours' Drug-Free Workplace Policy at pp. 14-15 (listing as "examples of observed behaviors of reasonable suspicion" several behaviors noted of Dr. True, including slurred speech, incoherent rambling, and hyperactive activity). As Dr. True admits in his Complaint, his sample tested positive for THC. *See* Complaint at ¶ 24. Dr. True does not dispute the accuracy of this drug test; to the contrary, he admits that at time of his drug test, he *was* in fact utilizing marijuana. *See id.*

After receiving Dr. True's positive drug screening, Nemours placed Dr. True on leave beginning on December 24, 2020, and referred him to the Professional Resource Network ("PRN") for an evaluation. *See id.* at ¶ 27. Dr. True later met with a PRN evaluator, during which he explained that he had received a medical marijuana card on January 5, 2021 – approximately two weeks ***after*** he had tested positive for marijuana. *See id.* at ¶ 29. After this evaluation, Dr. True alleges that the PRN evaluator recommended he attend an in-patient treatment program in connection with his admitted drug usage. *See id.* at ¶ 31. Dr. True claims that he was unable to afford this program and thus did not complete the treatment program. *See id.* at ¶ 32. As a result of

his failure to complete the course of action recommended by the PRN evaluator, Dr. True remained on leave[4] with Nemours through the duration of his contract. *Compare* at ¶ 33 (claiming Nemours "terminated" his employment in September of 2021) *with* GEMA at Preamble (indicating agreement expired by its own terms on June 30, 2021 – three months **prior** to September of 2021).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint on its face. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Rule 8 of the Federal Rules of Civil Procedure requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Id.* Rather, the plaintiff bears the burden of pleading facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[A] plaintiff's obligation to provide the grounds of [his] entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the

---

[4] While immaterial to the instant Motion and outside the scope of Dr. True's Complaint, this leave was *paid*.

elements . . . will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although Rule 12(b)(6) requires the Court to accept factual allegations as true for purposes of a motion to dismiss, "conclusory allegations . . . are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations." *McGee v. JPMorgan Chase Bank N.A.,* No. 8:11-cv-1099-JDW-TGW, 2011 WL 13136962, at *2 (M.D. Fla. Dec. 22, 2011) (internal quotation marks and citation omitted).

Moreover, when a plaintiff's own allegations make clear that his complaint will ultimately fail as a matter of law, rendering amendment futile, dismissal with prejudice is warranted and appropriate. *Brown v. Hillsborough Cty. Sch. Bd.*, No. 8:16-cv-3057-T-AEP, 2018 WL 10705860, at *4 (M.D. Fla. Mar. 5, 2018) (dismissing discrimination claim with prejudice).

## MEMORANDUM OF LAW

### A.   Because Dr. True Admits He Was Not A Qualified Individual With A Disability Under The ADA, Counts I and II Must Be Dismissed.

In Counts I and II of the Complaint, Dr. True claims that Nemours discriminated against him on the basis of either his alleged disability of anxiety or a perceived disability of "mental instability", in violation of the Americans With Disabilities Act (the "ADA") and the Florida Civil Rights Act (the

"FCRA"),[5] "by placing him on leave and forcing him to complete an [allegedly] unwarranted drug treatment program before he could return to the program and complete his residency." *See* Complaint at ¶¶ 42, 54.  Generally, in order to make out a *prima facie* case of disability discrimination in violation of the ADA or the FCRA, a plaintiff must allege: (1) that he has or was regarded as having a disability, defined by the ADA as a physical or mental impairment that substantially limits a major life activity; (2) that he was a ***qualified individual*** with a disability; and (3) that he was subject to some adverse action on the basis of his real or perceived disability.  *See generally Corning v. LodgeNet Interactive Corp.*, 896 F. Supp. 2d 1138, 1144 (M.D. Fla. 2012).  Not only has Dr. True failed to allege facts sufficient to make out a plausible case of discrimination, but his own allegations actually serve to ***bar*** any such claim.

More specifically, Dr. True's Complaint does not plausibly allege that he is a qualified individual under the ADA, which specifically ***excludes*** from its coverage "any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."  42 U.S.C. § 12114(a) (explaining that a "qualified individual with a disability ***shall not include***" such individuals (emphasis added)); *see also* 42 U.S.C. § 12210(a) (excluding from all provisions of ADA's coverage those engaging in illegal use

---

[5] "[A] claim brought under the FCRA is analyzed in the same manner as a claim brought under the ADA." *Reis v. Universal City Dev. Partners, Ltd.*, 442 F. Supp. 2d 1238, 1243 (M.D. Fla. 2006).

of drugs); *see e.g., Daniels v. City of Tampa*, No. 8:09-cv-1151T33AEP, 2010 WL 1837796, at *2 (M.D. Fla. Apr. 12, 2010) (holding that employee terminated in connection with positive drug/alcohol test was not qualified individual under Section 504 of Rehabilitation Act, which is analyzed under ADA's framework and definitions), *report and recommendation adopted*, No. 8:09-cv-1151-T-33AEP, 2010 WL 1837802 (M.D. Fla. May 4, 2010); *Tracy P. v. Sarasota Cty.*, No. 8:05-cv-927T27EAJ, 2007 WL 951740, at *6 (M.D. Fla. Mar. 28, 2007) (holding that plaintiff could not establish he was "qualified individual with a disability" under Title II of ADA based on illegal drug usage); *Scoggins v. Floyd Healthcare Mgmt. Inc.*, No. 414-cv-00274, 2016 WL 11544774, at *25 (N.D. Ga. June 10, 2016) (holding plaintiff was not qualified individual given her current use of illegal drugs), *report and recommendation adopted*, No. 414-cv-0027, 2016 WL 11544908 (N.D. Ga. Aug. 30, 2016); *Phillips v. PPG Industries, Inc.*, No. 5:14-cv-1274-VEH, 2015 WL 7458687, at *11 (N.D. Ala. Nov. 24, 2015) (holding plaintiff could not make out claim for disability discrimination in light of positive drug test). Because Dr. True has alleged that he was engaged in the illegal use of drugs during his employment with Nemours and that Nemours acted on the basis of such illegal drug usage when it placed him on leave, this exclusion is fatal to Dr. True's claim.

1.    **Dr. True Admits That He Engaged In The Illegal Use Of Drugs.**

First, Dr. True *admits* that at the time of his placement on leave, he was engaging in the illegal use of drugs.  By way of further explanation, the ADA defines the term "drug" as "a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substance Act."  42 U.S.C. § 12111(6)(B).  Marijuana, the drug to which Dr. True admits to using, is currently listed as a schedule I drug and is ***prohibited*** by the federal Controlled Substances Act.  *See* 21 U.S.C. § 812(b)(1)(B) (explaining schedule I drugs "ha[ve] no currently accepted medical use in treatment in the United States"); *id.* at § 812(c) sched. I(c)(10); *id.* at § 841(a); *id.* at § 844(a).

The ADA further defines the phrase "illegal use of drugs" as "the use of drugs, the possession or distribution of which is unlawful under the Controlled Substance Act."  42 U.S.C.A. § 12111(6)(A).  The phrase does not include, however, "the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substance Act or other provisions of Federal law."  *Id.*  To the extent Dr. True attempts to argue that his marijuana use – allegedly undertaken "under the direction and supervision of his mental health provider" – falls within this so-called "authorized use" exception, such argument is at odds with interpretative authority.  *See* Complaint at ¶¶ 24, 31, 38, 50.  To the contrary, the authorized use exception

13

has been interpreted narrowly as "contain[ing] **a *single exception covering all uses <u>authorized</u> by the CSA or other provisions of federal law***, including both CSA-authorized uses that involve professional supervision (such as use of controlled substances by prescription…), and other CSA-authorized uses." *James v. City of Costa Mesa*, 700 F.3d 394, 398 (9th Cir. 2012) (emphasis added).   In *James*, the Ninth Circuit considered whether plaintiffs' doctor-prescribed medical marijuana usage, authorized under California law (but not federal law), constituted disqualifying "illegal drug use" under the ADA.  The court reasoned:

> Under the plaintiffs' interpretation, their state-sanctioned, doctor-recommended marijuana use is covered under the supervised use exception. Under the cities' interpretation, the plaintiffs' state-authorized medical marijuana use is not covered by any exception *because it is not authorized by the CSA or another provision of federal law*.... [W]e hold, in light of the text and legislative history of the ADA, as well as the relationship between the ADA and the CSA, that the cities' interpretation is correct.

*Id.*  In sum, "state-authorized medical marijuana use is not covered by [the authorized used] exception because it is not authorized by the CSA or another provision of federal law." *Id.*  Thus, the fact that Dr. True allegedly used marijuana under the direction and supervision of his mental health provider and pursuant to a state statute allowing such usage does not save his

14

claim.[6]  *See, e.g., Eccleston v. City of Waterbury*, No. 3:19-cv-1614 (SRU), 2021 WL 1090754, at *6 (D. Conn. Mar. 22, 2021 ("[P]hysician-supervised medical marijuana use does not fit within the supervised-use exception identified in the ADA."); *Simmons v. Illinois Dep't of Hum. Rts.*, No. 20-cv-3243, 2021 WL 4497140, at *7 (C.D. Ill. Sept. 30, 2021) (dismissing Title II ADA claim when plaintiff was not "qualified individual" due to medical marijuana usage); *Forest City Residential Mgmt. v. Beasley*, 71 F. Supp. 3d 715, 731 (E.D. Mich. 2014) (holding medical marijuana user was "not a qualified individual with a disability under section 504 of the Rehabilitation Act because she uses an illegal drug (according to federal law)").

What is more, Dr. True ***admits*** that he did not receive his state-approved medical marijuana card until January 5, 2021 – nearly ***two weeks after*** Nemours placed him on leave following his positive drug screen.  *See* Complaint at ¶ 29.  Dr. True is simply unable to retroactively seek protection from this after-the-fact authorization and, as a result, would be unable to make

---

[6] Section 12114(b) lists three other exceptions to the rule that an individual currently engaging in the use of drugs is not a "qualified individual" entitled to the ADA's protection. *See* 42 U.S.C. § 12114(b)(1) (permitting exception for individual who "has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use"); 42 U.S.C. § 12114(b)(2) (permitting exception for individual who "is participating in a supervised rehabilitation program and is no longer engaging in such use"); § 12114(b)(3) (permitting exception for individual who "is erroneously regarded as engaging in such use, but is not engaging in such use").  None of these exceptions are applicable here, as Dr. True admits that he was still using marijuana and had declined to participate in the PRN-recommended treatment program. *See* Complaint at ¶ 31-32.

15

use of the authorized use exception ***even if*** such exception applied to one's use of drugs, like marijuana, that are illegal under federal law.

> **2.      Dr. True Admits That Nemours Acted On The Basis Of His Illegal Drug Use.**

Not only has Dr. True admitted that he engaged in illegal drug use during his employment with Nemours, but he has also admitted that Nemours specifically acted ***on the basis of*** such drug use when it placed him on leave following his positive drug screen.[7]  *See id* at ¶ 27.  Dr. True also admits that Nemours' decision to keep Dr. True on leave for the duration of his Appointment Term was due solely to his failure to complete the PRN-recommended treatment program.  *See id.* at ¶¶ 32-33.  In other words, by his own admission, Nemours' decision to place and keep Dr. True on leave was due directly to his illegal drug usage (and related failure to complete any rehabilitative program).  Such behavior is not prohibited by the ADA.  *See generally* 42 U.S.C. § 12114(d)(2) (making clear that "conducting…drug testing for the illegal use of drugs by job applicants or

---

[7] To the extent Dr. True argues that Nemours asking him to take a drug test is in and of itself a basis for his discrimination claim, an employer requiring an employee to submit to a drug test in keeping with its established policy is simply not an adverse action sufficient to support an intentional discrimination claim.  *See Keys v. Foamex, L.P.*, 264 F. App'x 507 (7th Cir. 2008) (holding that drug test did not amount to an "adverse employment action," as required to establish a *prima facie* Title VII claim for race discrimination, when the drug test was performed in a routine fashion and pursuant to the employer's drug policy after employer received reports about employee's strange behavior in the workplace); *Yelling v. St. Vincent's Health Sys.*, No. 2:17-cv-01607-SGC, 2020 WL 7059450, at *10 (N.D. Ala. Dec. 2, 2020) ("[M]erely being subjected to a drug test does not constitute an adverse employment action.").

employees or making employment decisions based on such results" is not prohibited).

In sum, if an employee engages in illegal drug use (which Dr. True **admits** he did) and if an employer takes an adverse action against the employee on the basis of such usage (which Dr. True **admits** Nemours did), that individual categorically falls outside the ADA's protection. Thus, because Dr. True's own allegations establish that he is not a qualified individual with a disability for purposes of his claim against Nemours, his claims for disability discrimination under the ADA and the FCRA must be dismissed **with prejudice**. *See Connell v. Poynter*, No. 8:19-cv-668-KKM-CPT, 2021 WL 2258405, at *6 (M.D. Fla. June 3, 2021) ("Because Plaintiff is unable to state a claim under the ADA against the Defendants as a matter of law, Plaintiff's ADA claim will be dismissed with prejudice.").

## B. Because Dr. True's Own Allegations Undermine His Breach Of Contract Claim Against Nemours, Count III Must Be Dismissed.

In addition to his doomed disability discrimination claims, Dr. True also brings a common law breach of contract claim against Nemours stemming from Nemours' alleged violation of the 2020-2021 GEMA. In order to state an actionable claim for breach of contract, a plaintiff must sufficiently allege: (1) the existence of a contract; (2) a breach of the contract; and (3) damages resulting from the breach. *See Heron v. Rappa*, No. 3:11-cv-423-J-34TEM,

17

2012 WL 2589231, at *10 (M.D. Fla. Feb. 6, 2012) (dismissing breach of contract claim), *report and recommendation adopted*, No. 3:11-cv-423-J-34TEM, 2012 WL 2586223 (M.D. Fla. July 3, 2012). While Dr. True alleges (in conclusory fashion) that Nemours breached the GEMA and that he was damaged as a result, both the language of the GEMA and Dr. True's own factual allegations undercut essential elements of his claim against Nemours. As a result, Dr. True has not made out a plausible claim for breach of contract, ***nor can he***, and Count III must therefore be dismissed with prejudice.

**1.    Dr. True Does Not Plausibly Allege That Nemours Breached The GEMA By Failing To Evaluate His Performance In Violation Of The ACGME Residency Requirements.**

First, with respect to Nemours' alleged breach, Dr. True claims that Nemours breached the GEMA by "fail[ing] to evaluate, in accordance with the ACGME requirements..., Plaintiff's performance on the rotation that ultimately led to Plaintiff's dismissal from the program." *See* Complaint at ¶ 63. Specifically, Dr. True claims that Nemours failed to comply with ACGME Residency Requirement Section V.A.1.a), which provides that "faculty members must directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment." *See id.* at ¶ 62. Dr. True further states that Nemours did not comply with this specific ACGME requirement because "the attending physicians who worked with Plaintiff failed to evaluate, in accordance with [this guideline] Plaintiff's

18

performance on the rotation that ultimately led to Plaintiff's dismissal from the program." *See id.* at ¶ 63.

Dr. True's own factual allegations, however, belie these very conclusions. In fact, Dr. True *admits* that in December of 2020, Dr. Hoffman presented him with a number of complaints from hospitalist attending physicians regarding his performance. *See id.* at ¶¶ 18-20. These complaints, which by Dr. True's own admission concerned his performance, constitute the very type of ***evaluation*** – based upon ***direct observation*** – contemplated by the ACGME Residency Requirements, and the purpose of Dr. Hoffman's meeting with Dr. True was to ***provide feedback*** on the same. *See id.* Dr. True's admissions that these hospitalists had "previously provided extremely positive feedback," *see id.* at ¶ 18, demonstrate that he ***was*** in fact receiving feedback in accordance with the ACGME Residency Requirements.  Meanwhile, his claim that "none of these complaints were ever brought to [his] attention," *see id.* at ¶ 64, is immaterial, as the ACGME Residency Requirements simply do not prohibit evaluators from providing ongoing (and sometimes changing) reviews of a resident's performance, require evaluators to provide feedback directly to a resident (versus providing feedback to the program director), or require that evaluators raise specific concerns or provide an evaluation in the middle of or even immediately following the resident behavior or performance giving rise

19

to the concern or evaluation.[8]  Instead, the ACGME Residency Requirements simply provide that faculty members must observe, evaluate, and provide feedback on resident performance and that evaluation "must be documented at the completion of the assignment."  *See* ACGME Residency Requirements, at Section V.A.1.b).   Moreover, nothing in the ACGME Residency Requirements – which are inherently ***educational*** in nature and applied to Dr. True in his role as a ***student,*** *see id.* at Int.A. (explaining requirements govern "graduate medical *education*" (emphasis added)) – prevented Nemours from taking appropriate action to enforce its ***workplace*** safety and disciplinary policies and procedures that governed Dr. True as an ***employee***. *See generally Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 60 (2011) (addressing dual nature of medical residents and holding that, while "[w]e do not doubt that Mayo's residents are engaged in a valuable educational pursuit," they are nonetheless employees for purposes of the Federal Insurance Contributions Act).  In other words, Dr. True can point to no action taken by Nemours in service of enforcing its Drug-Free ***Workplace*** Policy, including requiring Dr. True to take a reasonable suspicion drug test

---

[8] Similarly, Dr. True's allegation that "[d]uring [his] residency, he did not receive any reports of issues or concerns regarding his performance," is also belied by his allegations that Dr. Hoffman in fact *did* present him with a number of concerns regarding his performance in December of 2020 – *during his residency*. *Compare* Complaint at ¶10, *with id.* at ¶ 18; *see also* 2020-2021 GEMA (showing term of 2020-2021 Appointment Term ran from residency ran from July 1, 2020 to June 30, 2021 and encompassed December 2020 meeting).

and placing him on leave following his failed test and refusal to complete the recommended rehabilitative program, that was in any way prohibited or even addressed by the education-based ACGME Residency Requirements. Nemours was simply not required, under the ACGME Residency Requirements or elsewhere, to provide *any* specific feedback to Dr. True as to his failure to abide by its employment policies, and Dr. True's allegations that Nemours breached the GEMA by failing to do so are not plausible.

In sum, Dr. True's Complaint falls short of plausibly alleging that Nemours breached the GEMA by failing to provide this required evaluation. What is more, his own allegations actually make clear that Nemours *did* in fact provide evaluation and feedback as contemplated by the ACGME Residency Requirements. *See Puls v. American Airlines, Inc.*, No. 8:17-cv-1024-T-36TGW, 2018 WL 11256028, at *3 (M.D. Fla. June 11, 2018) (dismissing breach of contract claim because plaintiff failed to allege actual breach of contract); *Whitney Nat. Bank v. SDC Communities, Inc.*, No. 809-cv-01788EAKTBM, 2010 WL 1270264, *3 (M.D. Fla. Apr. 1, 2010) (stating that complaint does not put defendant on sufficient notice of breach of contract claim without sufficient enumeration of underlying breach). As a result, any breach of contract claim premised on Nemours' supposed failure to provide evaluation and feedback must be dismissed with prejudice.

21

2.    **Dr. True Does Not Plausibly Allege That He Suffered Any Damage As a Result Of Nemours' Supposed "Failure To Evaluate."**

Further, based on the allegations in his Complaint, it is not plausible that Dr. True suffered any damages, let alone the "loss of his…medical education and future ability to practice medicine," ***as a result of*** Nemours' alleged "failure to observe." *See* Complaint at ¶¶ 66-67.

First, the allegations in Dr. True's Complaint directly undercut his conclusory statements to this effect.  For example, Dr. True makes clear that it was his failed drug test and failure to complete the PRN-recommended treatment program – and *not* any supposed lack of feedback – that contributed to the "pause" in his medical education and career path.  *See id.* at ¶ 34 (admitting that "[a]s a result" of his positive drug screen and placement on leave, described in Paragraphs 27 through 33, Dr. True "suffered a significant loss of income, damage to his reputation, detrimental interruption and delay in his residency/medical education, and damage to his medical career").

Further, had the attending hospitalist physicians who provided the E-mail Complaints that formed the basis of Dr. Hoffman's December meeting with Dr. True provided this feedback via some alternative forum (*i.e.,* directly to Dr. True or in accordance with whatever unidentified – and nonexistent – specific ACGME Residency Requirement Dr. True claims Nemours violated), such further evaluation would have had no corrective effect or changed the

22

outcome for Dr. True with Nemours.  More specifically, Dr. True **admits** that he does not agree with the evaluations he received, which he describes as containing "false allegations."  *See id* at ¶ 21; *see also id.* ¶ 66 ("Had Plaintiff **actually engaged** in the conduct alleged by the attending physicians and hospitalists…" (emphasis added)).  These allegations constitute an admission on the part of Dr. True that **even if** Nemours had expressed the same concerns Dr. Hoffman presented to Dr. True during the December 2020 meeting via some alternative means or forum, such secondary evaluation would have had no impact on his behavior or, notably, the results of his positive drug test.  This in mind, Dr. True's conclusory statements that any damages he claims to have suffered were the result of Nemours' alleged "failure to evaluate" are directly contradicted by own his own factual allegations. *See generally White-Lett v. New Penn Fin., LLC*, No. 1:17-cv-03385, 2018 WL 6839277, at *8 (N.D. Ga. Sept. 4, 2018) (granting motion to dismiss where pleading did not differentiate between damages caused by different causes of action), *report and recommendation adopted*, No. 1:17-cv-3385, 2019 WL 7493539 (N.D. Ga. Apr. 1, 2019); *Patrick v. CitiFinancial Corp., LLC*, No. 3:15-cv-296-WHA, 2015 WL 5236031, at *5 (M.D. Ala. Sept. 8, 2015) (dismissing claim where plaintiff failed to plead causal connection between alleged violation and emotional distress damages and, in doing do, noting that damages were attributed to other claims).

23

Finally, Dr. True's claims regarding the ***scope*** and ***type*** of his supposed damages are not plausible.  Again, Dr. True appears to confuse his roles as student and employee, claiming nonsensically that a consequence he suffered as an employee in response to his violation of Nemours' Drug-Free Workplace Policy negatively impacted his educational path as a student, further forestalling his ability to practice medicine.  It is simply not plausible that any action (or inaction) on the part of Nemours as it enforced its employment policies led to the type of large-scale educational and career damages Dr. True alleges.  For this reason, as well as his failure to plausibly allege any breach on the part of Nemours with respect to the 2020-2021 GEMA, Count III of Dr. True's Complaint must be dismissed with prejudice.

## CONCLUSION

Not only has Dr. True failed to state a plausible claim for relief, but his own allegations make clear that he will be ***unable*** to do so.  A claim for disability discrimination will not lie when one has effectively admitted he is not a qualified individual entitled to protection under the ADA or FCRA; nor can amendment save a breach of contract claim for which a plaintiff has both pled compliance with (and not breach of) the contractual provision at issue and also offered the real, unrelated cause for any alleged damage suffered.  As a result, Nemours respectfully requests that the Court dismiss Dr. True's Complaint in full and with prejudice.

24

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g) of the Middle District of Florida, Nemours' counsel conferred in good faith by phone with counsel for Dr. True on March 30, 2022. The Parties were unable to reach resolution as to the instant Motion to Dismiss, and Dr. True's counsel opposes the relief requested.

Dated: April 4, 2022.

Respectfully submitted,

*/s/ Mary Caroline Cravatta*

John S. Lord, Jr.
Florida Bar No. 16527
jlord@foley.com
jbegona@foley.com
Kate L. Pamperin
Florida Bar No. 1026546
kpamperin@foley.com
FOLEY & LARDNER LLP
One Biscayne Tower
2 South Biscayne Blvd.
Suite 1900
Miami, Florida 33131
Telephone: 305.482.8400

Mary Caroline Cravatta
Florida Bar No. 125712
mcravatta@foley.com
FOLEY & LARDNER LLP
301 E. Pine Street
Suite 1200
Orlando, Florida 32801
Telephone: (407) 423-7656

**Counsel for The Nemours Foundation**

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on April 4, 2022, a copy of the foregoing was

electronically filed via CM/ECF, which will effect service on all counsel of record

identified below.

> Deborah E. Frimmel
> deborah@burruezolaw.com
> docketing@burruezolaw.com
> BURRUEZO & BURRUEZO, PLLC
> 911 Outer Road
> Orlando, Florida 32814

> */s/ Mary Caroline Cravatta*
> Mary Caroline Cravatta

4881-1319-7842.3